RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID L. GAVITT,

       *Plaintiff-Appellee* (15-2136),

       *Plaintiff-Appellant* (15-2434),

    *v.*

BRUCE BORN, personal representative of Estate of John E. DeVries,

       *Defendant-Appellant* (15-2136),

COUNTY OF IONIA; GARY M. GABRY; RAYMOND P. VOET; GAIL BENDA; RONALD J. SCHAFER; CITY OF IONIA; KENNETH E. VOET; RANDALL W. KLEIN; JOHN P. FATCHETT; JOHN J. KALMAN, JR.,

       *Defendants-Appellees* (15-2434).

> Nos. 15-2136/2434

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-12164—Nancy G. Edmunds, District Judge.

Argued: August 3, 2016

Decided and Filed: September 1, 2016

Before: CLAY, ROGERS, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Joseph T. Froehlich, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant in 15-2136 and Appellees Fatchett and Kalman in 15-2434. Christopher P. Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellee in 15-2136 and Appellant in 15-2434. Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Ionia County Appellees in 15-2434. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for City of Ionia Appellees in 15-2434. **ON BRIEF:** Joseph T. Froehlich, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,

1

Lansing, Michigan, for Appellant in 15-2136 and Appellees Fatchett and Kalman in 15-2434. Christopher P. Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellee in 15-2136 and Appellant in 15-2434. Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Ionia County Appellees in 15-2434. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for City of Ionia Appellees in 15-2434.

------------------------

**OPINION**

------------------------

McKEAGUE, Circuit Judge. Plaintiff in the action from which these two appeals arise, David Gavitt, was sentenced to life in prison in 1986 after a jury found him guilty of arson and felony murder, charges stemming from a house fire that took the lives of his wife and two daughters. In June 2012, the state court granted Gavitt's unopposed motion for relief from judgment based on newly discovered evidence. The newly discovered evidence is in the nature of advancements in fire science research and investigation methods that tend to impugn some of the evidence on which Gavitt's convictions were based. The judgment was vacated, the charges dismissed, and Gavitt was released from prison.

Two years later, Gavitt brought this civil rights action against numerous city and county entities, prosecutors, law enforcement officials, and investigators who participated in the prosecution against him. He claims that defendants violated his due process rights by intentionally misrepresenting evidence and failing to disclose exculpatory evidence, and that they conspired to deprive him of his rights. All defendants moved to dismiss on the pleadings and the district court granted all but one of the motions, that of the Estate of John DeVries, a Michigan State Police forensic laboratory technician who testified at Gavitt's trial.[1] While the district court identified legal deficits that warranted dismissal of most of Gavitt's claims, it held that Gavitt's claim against DeVries included sufficient factual allegations to state a valid claim for relief.

We now address two appeals stemming from the district court's rulings. First, in No. 15-2136, the Estate of DeVries challenges the denial of its motion to dismiss based on qualified

------------------------

[1]John DeVries died in 1994. His Estate is represented in this matter by Bruce Born, special personal representative.

immunity. In short, the Estate contends the district court read Gavitt's claim too generously, failing to recognize that the public record made in state court contradicts his allegations, rendering the claim implausible. Second, in No. 15-2434, Gavitt challenges the dismissals of his claims against the other defendants, contending that his allegations pass muster at the pleading stage and that he deserves the chance to conduct discovery. For the reasons that follow, we deny relief in both appeals. The Estate's appeal must be dismissed for lack of appellate jurisdiction. As to the second appeal, we affirm, finding no error in the dismissals of Gavitt's claims against the remaining defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Each of the district court's substantive rulings includes substantially the same summary of the factual and procedural background. No party having disputed the accuracy of the summary, it is reproduced here:

### A. Fire, Investigation, Arrest, Trial, and Conviction

Gavitt survived a March 9, 1985 house fire. His wife and two daughters tragically did not. An investigation was initiated by the City of Ionia Police Department and the Michigan State Police Arson Task Force.

On the morning of March 10, 1985, Defendants Kalman and Fatchett, then-Michigan State Police ("MSP") officers assigned to the MSP Arson Strike Force Unit ("Det./Sgt. Kalman" and "Det./Sgt. Fatchett" respectively), were dispatched to the scene of the house fire to investigate its cause and origin. Based on their initial review of the evidence, they concluded that the fire was incendiary in nature. At 2:30 in the afternoon that same day, Det./Sgts. Kalman and Fatchett summoned Defendant Klein, then-Sergeant with the Ionia Police Department ("Sgt. Klein"), to the burned home, walked him through the evidence at the fire scene that led them to their initial conclusion that the fire was incendiary in nature, and collected evidence that Sgt. Klein then placed in an Ionia Police Department evidence locker. Sgt. Klein then continued his investigation by obtaining evidence from and interrogating Plaintiff David Gavitt ("Gavitt"), and obtaining more evidence from the burned home.

On March 12, 1985, as reported in Det./Sgt. Kalman's March 1985 Report, a meeting was held "for the purpose of reviewing the evidence and determining the course of the investigation." Defendant Prosecutor Gabry is listed as being present. Det./Sgt. Kalman reported that he presented evidence, a

discussion was held, and a conclusion reached that Gavitt may have set the fire himself and was unable to save his family once the fire started:

> Undersigned officer explained the burn patterns and also relating [sic] the burn patterns to the burns on the victim. A formal discussion was held on all the evidence obtained and it is the feeling that there is strong evidence pointing to the fact that MR. DAVID GAVITT may have indeed set the fire himself and was unable to save his family once the fire started.

Sgt. Klein's March 20, 1985 Report also discussed the March 12th meeting and calls it a "'skull session' starting at/around 8:30 am, ending a short time later." Sgt. Klein does not list Prosecutor Gabry as being present. Rather, he reports:

> <u>Journal Entry</u>: It was on TUES, MARCH 12th, 1985 that this investigating officer, Sgt. Wieczorek and Chief Voet met with the following: City Superintendent Allen Housler, Det/Sgt. JOHN KALMAN and Det/Sgt. JOE DeKRACKER of the Arson Strike Force, MSP Rockford Post, this meeting was an "initial assessment of the case". It should be noted that this meeting was a "skull session" starting at/around 8:30 am, ending a short time later.

On June 10, 1985, a felony complaint was issued, and state criminal charges were brought against Gavitt – three counts of murder, three counts of felony murder, arson, and arson insured property – and he was subsequently arrested. Sgt. Klein was the complaining witness on the criminal complaint.

On June 21, 1985, a preliminary examination hearing was held on the criminal charges brought against Gavitt. District Court Judge James Ward was the presiding judge and Defendant Gabry was the prosecutor. The District Court found that probable cause existed on the charged offenses – murder, felony murder, and arson – but dismissed the insurance fraud charge.

A jury trial was held in the Circuit Court for the County of Ionia. On February 14, 1986, a jury convicted Gavitt on three counts of murder committed in the perpetration of arson (first degree felony murder) and one count of arson to a dwelling place. The one count of arson was dismissed by the Court at sentencing.

On April 18, 1986, Gavitt was sentenced to "imprisonment for life on each of the three counts of murder, to be served concurrently with each other."

**B. Innocence Clinic's Post-trial Motion for Relief, Stipulation, and Dismissal**

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic,

arguing that there was newly discovered scientific analysis of the origin and cause of the March 1985 fire establishing that there was no arson.  That motion explained that evidence of actual innocence was only recently discovered because, beginning in 1992, there has been a complete revolution in the field of fire investigation:

> 14. The field of fire investigation has undergone a complete revolution since Mr. Gavitt was convicted in 1986.  In 1992, the National Fire Protection Association adopted NFPA 921, the current standard of care for fire investigations, which for the first time put the field of fire investigation on a scientific basis.

> 15. In light of the changes in the field of fire investigation, John Lentini – a world-renowned fire investigator who has reviewed all available testimony and evidence in this case – has concluded that there is no basis to conclude that arson was the cause of the Gavitt fire.  Mr. Lentini's affidavit is attached to the brief accompanying this motion.

> 16. Mr. Lentini's findings are rooted in the crucial concept of "flashover," which was not well understood by the fire investigation community at the time of Mr. Gavitt's trial.  During flashover – a phenomenon that takes place when a compartment like the Gavitt living room catches fire – a room becomes so hot that every exposed combustible surface can catch fire.

> \* \* \* \* \*

> 29. Mr. Lentini's scientific conclusions regarding the origin and cause of the Gavitt fire meet this [newly discovered evidence] test. His findings are based on the new standards of origin and cause investigation, which were not adopted until the early 1990s, at the earliest, years after Mr. Gavitt's trial.  The evidence refutes all scientific evidence presented at trial, so it is not cumulative.  Further, because the prosecution's case relied wholly on the testimony of fire experts, no rational jury could have found Mr. Gavitt guilty of murder if the findings of Mr. Lentini or any competent fire investigator applying modern standards had been presented.  This is particularly true when this evidence is considered alongside the new evidence regarding the absence of gasoline on the carpet samples. . . .

> 30. Finally, because the field of gas chromatography was much less precise in 1986 than it is today, trial counsel could not have discovered the new evidence that undermines Mr. DeVries's testimony through the exercise of due diligence, and the fourth and

final prong for granting a new trial based on newly-discovered evidence is satisfied.

The supporting brief relied heavily on John Lentini's Affidavit and similarly argued that, because of "significant advancements in the field of fire science and arson investigation," there is newly-discovered evidence that undermines the prosecution's case against Gavitt:

> While the investigation of this case was, perhaps, normal for a fire investigation conducted in the mid-1980s, approximately a decade before scientific principles were first applied to fire investigation, practically all of the investigative methods and conclusions reached by the various fire investigators in this case fail to meet modern standards of accuracy and reliability.
>
> * * * * *
>
> The field of fire investigation has undergone a complete revolution since Mr. Gavitt's conviction. John Lentini Affidavit ¶¶ 15-59. Theories that low-burning, alligatoring, pour patterns, depth of char, and temperature and speed of fires can serve as indicators of arson were once unquestioned, but have been completely and unequivocally repudiated by rigorous scientific testing. *Id.* at ¶¶ 36-59. As such, every indicator of arson relied upon by the prosecution's experts at Mr. Gavitt's trial has been discredited and is understood to be useless in determining the true origin and cause of fires. *Id.* Many factors once thought to be present only in accelerated fires are now understood to be present in natural fires that have undergone flashover and progressed to full room involvement, a phenomenon that was not understood in 1986[.] *Id.* at ¶¶ 29-35.
>
> * * * * *
>
> Mr. Lentini's finding that Mr. DeVries's testimony about the carpet flame tests was false meets all parts of the standard for newly-discovered evidence. Given that the understanding of flashover is a novel concept in arson science and certainly was not known outside of a very small subset of the scientific community at the time of Mr. Gavitt's trial, the evidence itself and not merely its materiality is newly-discovered. For this same reason, it is clear that the evidence could not have been discovered with due diligence at the time of trial; indeed the concept of flashover would not become widely known and understood by fire investigators until at least a decade after Mr. Gavitt's conviction. . . .

As Mr. Lentini admitted in his affidavit, at the time that Sgt. Fatchett and the Ionia County Prosecutor's expert, Dr. Edwards, considered the impact of flashover, they had no way of knowing that their generally accepted interpretations of burn patterns would be refuted years later:

> Neither Sgt. Fatchett nor Dr. Edwards considered the impact of flashover and the impact of the burning curtains when they attempted to discern what caused the patterns they observed on the living room floor in the course of their investigation. Nor would such consideration have been expected in 1986, because the state of the art in fire investigation had not come to fully recognize flashover at that time.
>
> * * * * *
>
> All of the above testimony [Defendant Fatchett's trial testimony evaluating evidence from the fire and opining that the fire was intentionally set] can be shown by today's standards to have been false and misleading, albeit without malicious intent. . . .
>
> * * * * *
>
> The State's experts had no way of knowing that their interpretation of the burn patterns at the Gavitt residence was without any scientific validity because, at the time of the trial, those interpretations were, in fact, generally accepted by most fire investigators, including your affiant. The misinterpretation was bolstered by the incorrect laboratory analysis performed by Mr. DeVries. The state's fire investigators "expectations" were not properly "calibrated." They expected the confined fire in the Gavitt residence to behave like an unconfined fire. Because the fire did not meet their expectations of normal fire behavior, they incorrectly determined the fire to be incendiary.

An experienced fire investigator that Gavitt's defense attorney consulted with in 1985 also provided an affidavit which was attached as an exhibit to Gavitt's motion for relief. Mr. Churchwell, like Mr. Lentini, stressed that "the world of fire science is vastly different today than it was in 1985;" that the way he "would have viewed the fire scene in 1985 is completely different from the way" he "would view the same scene today;" and "the advancements in fire science would enable [him] to have far better insights and be wary of false findings today." Mr. Churchwell, like Mr. Lentini, stated that he subscribed to the same beliefs that science has now proven to be false; that he can say now that Gavitt was falsely convicted; but could not have reached that conclusion in 1985-86 when he was consulting with defense counsel:

Well into the 1980's, the arson investigation profession believed that things like floor burn patterns, low burning, deep charring and alligatoring were automatic indicators of arson: <u>I subscribed to those beliefs at one time as well</u>. But in the 1990s, with a wider understanding of the concept of flashover and the emergence of NFPA 921, <u>the profession grew up and began to embrace the rigors of actual science</u>. Upon doing so, the open-minded among us <u>discovered that the old indicators that we thought were automatic markers of arson were in fact not</u>. This led to the realization that each of us – investigators who had worked in the 1970s and 1980s – had misread many fire scenes, possibly leading to the conviction of innocent people. I have no doubt in my mind that David Gavitt is one such falsely-convicted person. <u>I can say this knowing what I know today, but such a conclusion would have been impossible for me to make in 1985-86 (when Mr. Kolenda consulted with me) because the profession had yet to become enlightened to the errors of the old ways of arson investigation at that time</u>.

Mr. Churchwell also admitted that he "would likely have made the same mistake" as those investigating the Gavitt home fire by failing to give adequate consideration to possible accidental causes of that fire:

As I know from having worked many similar fires in the 1980s, the fact that obvious sources of ignition and the presence of various fuels (candles, ashtray, oil lamps, paneling, etc.) went largely ignored at the trial is not all that surprising. In those days, fire investigators would look first for pour patterns, alligatoring and other such things, and upon finding them, we would assume the fire was arson – so much so that we'd ignore far more obvious accidental sources of the fire. I have no doubt that the investigators who looked at the fire scene at the Gavitt home made this mistake. <u>As cautious and careful as I always try to be, I would likely have made the same mistake upon seeing the Gavitt fire scene in 1986: Fire investigators simply did not have enough knowledge about the true nature of enclosed (compartment) fires at that time. Today, years later, being wise to the many advancements</u> and the rigors of actual science <u>that have finally come to dominate the arson investigation profession</u>, I can say that the prosecution's experts were blinded by the myths (alligatoring, charred glass, low burning, etc.), and failed to give due deference to far more obvious and likely accidental sources of the fire.

The parties stipulated to a stay of Gavitt's motion, allowing the Ionia Prosecutor's Office time for scientific review of Gavitt's claims. On June 6, 2012, after a thorough investigation, current Ionia County Prosecutor Ronald

Schafer, on behalf of the People of the State of Michigan, responded to Gavitt's motion.

Prosecutor Schafer acknowledged that, although "fire investigators" involved in the original investigation "held to a common understanding within fire investigation," it is now known that that "was inaccurate, specifically regarding the recognition and identification of unusual burn patterns in the floor as definitive evidence of ignitable liquid pour patterns. Unfortunately, during that time period many fire investigators did not understand the phenomena of flashover and post-flashover and their effects on the production of unusual burn patterns in floors within compartments." Prosecutor Schafer also acknowledged that Gavitt had satisfied the requirements for a new trial.

> [T]he Peoples [sic] recent investigation confirms the 1985 findings which found the presence of accelerants on the carpet samples introduced at trial can no longer be independently verified as having a presence of ignitable liquids, specifically gasoline. Therefore, the parameters for meeting the legal requirement for a new trial are not disputed.

Despite an admission that "three independent analyses of the evidence suggest there was likely no gasoline on the carpet samples taken out of the Gavitt house in 1985," Prosecutor Schafer emphasized that "there are still a great deal of questions surrounding this case which raise significant questions." "Still today, these unanswered questions linger when looking at the case on the whole, even in light of the acknowledged findings in this response. In fact, this is the exact type of case that would have remained open had it not been prosecuted earlier; the type of case where justice would demand that it stay open." Nonetheless, Prosecutor Schafer acknowledged, "it does not change the fact that fire investigation has advanced in the twenty-seven years since this fire."

Prosecutor Schafer identified some of those fire investigation advances and explained why, in light of those advances, Gavitt cannot be retried.

> In particular, our understanding of flashover, post-flashover and the production of unusual burn patterns in floors, potentially identified as pour patterns, is different today than in 1985. Testing of materials in fire cases has also advanced, with more sophisticated instrumentation and analysis. Consequently, there is new evidence in this case and [Gavitt] is entitled to a new trial. As outlined, based on today's understanding of fire dynamics and the evolved level of fire investigation, this fire incident would likely be classified as undetermined and consequently the People will not be able to retry [Gavitt] . . . . there is only one thing known with certainty, as of today, this case involves a fire of undetermined

origin and cause. Having no laboratory verification of the presence of an accelerant, combined with what the People now know through scientific research and testing regarding flashover and post-flashover compartment fires, and the production of unusual burn patterns in the floor, the determination that an ignitable liquid (gasoline) was used to initiate the fire at the Gavitt residence cannot be verified. As a result, this is a case this office could not charge as arson based on the evidence available today. However, this is also a case that, if it was new today, this office would not close. There are simply too many questions, questions which may never be answered. Ultimately, this remains a case in which the lives of three innocent people were taken by a fire that can only be classified as having an undetermined origin and cause.

On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted, that all charges against Gavitt be immediately dismissed, and that the Court order his immediate release from the custody of the Michigan Department of Corrections.

R. 93, Opinion at 2–11, Page ID 3006–15 (citations omitted) (emphasis in original).

Following his release from prison, Gavitt filed the instant action, alleging that his wrongful conviction was not merely the product of a tragic but innocent misunderstanding of scientific evidence. In an eleven-count, 59-page complaint, he asserted claims against numerous defendants under state and federal law. Gavitt contends that members of the prosecution team—attorneys and law enforcement officials denied him a fair trial by conducting an incomplete investigation, misrepresenting evidence, and failing to disclose exculpatory evidence. The district court dismissed Gavitt's state law claims *sua sponte*, declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). Next, after conducting a hearing on defendants' motions to dismiss or for judgment on the pleadings, the court issued orders on December 15, 2014, dismissing Gavitt's claims against all defendants. However, Gavitt was permitted to file an amended complaint against the Estate of DeVries. The Estate's motion to dismiss the amended complaint was denied on August 24, 2015.

When the Estate filed its notice of appeal, the district court stayed further proceedings below, pending resolution of the interlocutory appeal. The court also certified its dismissals of the claims against the other defendants as a final judgment under Rule 54(b) so that Gavitt could pursue his appellate rights in conjunction with the Estate's interlocutory appeal.

## II. ESTATE'S APPEAL (No. 15-2136)

### A. Appellate Jurisdiction[2]

The Estate's appeal challenges an interlocutory ruling that would not ordinarily be subject to immediate review.  However, a pretrial order denying qualified immunity is immediately appealable under the collateral order doctrine if it implicates only questions of law. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018–19 (2014); *McDonald v. Flake*, 814 F.3d 804, 812–13 (6th Cir. 2016).  Where, as here, qualified immunity is raised and denied at the pleading stage, and the district court was obliged to accept as true all well-pled factual allegations in the complaint, the defendant ordinarily cannot challenge on interlocutory appeal the district court's acceptance of those facts.  *See McDonald*, 814 F.3d at 812–13.  If the defendant challenges the lower court's determination of the sufficiency of the evidence supporting the plaintiff's claim, then something other than a pure issue of law is presented and appellate jurisdiction is lacking. *See DiLuzio v. Village of Yorkville, Ohio*, 796 F.3d 604, 609–10 (6th Cir. 2015).

Gavitt's amended complaint sets forth one claim against the Estate of DeVries.  In short, it alleges that DeVries "either intentionally or with deliberate indifference and/or with reckless disregard for the truth" . . . "falsely reported and testified" that carpet samples taken from the living room of Gavitt's house would not burn without adding an accelerant, and that chromatographic analysis of the carpet samples showed residues of highly evaporated gasoline. R. 79, Amended Complaint ¶¶ 23, 26, 51, Page ID 2530, 2536.  To the extent the claim is premised on DeVries' testimony, the district court ruled that DeVries enjoys absolute immunity. To the extent the claim is premised on pretrial investigatory acts by DeVries, the court held DeVries is not entitled to absolute immunity.  This ruling is not challenged on appeal.

In response to DeVries' assertion of qualified immunity, the district court held that, accepting Gavitt's allegations as true, he has adequately stated a claim for knowing fabrication of false and misleading test reports that contributed to a violation of Gavitt's clearly established

---

[2]Gavitt has not moved for dismissal of the appeal for lack of appellate jurisdiction, but he has preserved the objection.  Moreover, the court is always obliged to assure itself of its own jurisdiction before proceeding.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

civil rights. The Estate insisted that these allegations need not be accepted as true because they are conclusively contradicted by the public record, but the court rejected the argument:

> Even assuming, *arguendo*, that the Court was inclined to accept Defendant's interpretation of DeVries' conduct based on the extensive public record in this case, there is a plethora of evidence supporting the opposite conclusion. In fact, both of the experts retained in connection with Gavitt's motion for relief from judgment in the State court concluded that the gas chromatographs did not indicate the presence of gasoline. While far from dispositive of DeVries' liability, the court is hard-pressed to imagine a scenario less deserving of qualified immunity at the pleadings stage.

R. 93, Opinion at 16–17, Page ID 3020–21 (citations omitted). The court thus determined that the public record does not conclusively establish that Gavitt's claim is implausible.

On appeal, the Estate maintains that Gavitt should not be permitted to conclusorily allege that DeVries "intentionally" fabricated or misrepresented any evidence. The Estate contends the district court erred by accepting the truthfulness of allegations that "are directly contradicted by undisputable public records." The Estate argues the record shows, at worst, that DeVries made a mistake, and since DeVries is deceased, there is no possibility of developing additional evidence of his subjective state of mind.

It may be unlikely that discovery will uncover any evidence that the falsity or inaccuracy in DeVries' results were the product of intentional deceit or recklessness. Yet, by inviting the reviewing court to predict or speculate about potential factual development, the Estate asks us to do precisely what we may not do. Consider the following guidance from *McDonald*:

> Thus, we may decide an appeal challenging the district court's legal determination that the defendant's actions violated a constitutional right or that the right was clearly established. We may also decide an appeal challenging a legal aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence. And we may decide, as a legal question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as "blatantly contradicted by the record, so that no reasonable jury could believe it."

> We may not, however, decide an appeal challenging the district court's determination of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." Because such a challenge is purely fact-based, lacking any issue of law, it "does not present a legal question in the sense in

which the term was used in *Mitchell* [*v. Forsyth*, 472 U.S. 511 (1985)]," and is therefore not an appealable "final decision" within the meaning of 28 U.S.C. § 1291. These types of prohibited fact-based ("evidence sufficiency") appeals challenge directly the plaintiff's allegations (and the district court's acceptance) of "what [actually] occurred[ ] or *why an action was taken or omitted*," who did it, or "nothing more than whether the evidence could support a [jury's] finding that particular conduct occurred."

*McDonald*, 814 F.3d at 812–13 (citations omitted) (emphasis added).

Thus, we lack authority to decide an appeal challenging the district court's determination that Gavitt *may* be able to adduce evidence supporting the allegation that DeVries acted knowingly or recklessly. The Estate's appeal challenges the district court's acceptance of the adequacy of Gavitt's allegations of *why an action was taken*, i.e., why DeVries reported erroneous test results. It thus represents a "prohibited fact-based evidence sufficiency" appeal subject to dismissal for lack of appellate jurisdiction.

While the likelihood that discovery will reveal evidence of intentional or reckless wrongdoing by DeVries may be minimal, it is not inconceivable. And although parts of the state court record tend to undermine Gavitt's claim against the Estate, we cannot say those parts so blatantly and conclusively contradict Gavitt's allegations that, upon further development of the record, no reasonable jury could find in his favor. This appeal is thus distinguishable from those addressed in *Scott v. Harris*, 550 U.S. 372, 378–80 (2007), and *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). In each of those cases, denial of qualified immunity at the *summary judgment stage* was reversed because the plaintiff had failed to adduce evidence creating a triable fact issue on an essential element of a claim. Here, in contrast, at the pleading stage, Gavitt's allegation of DeVries' culpable state of mind is *partially* refuted by the *partially* developed factual record. As the district court observed, however, the state court record also lends support to Gavitt's claim. The extant record is neither so complete nor so clear as to permit a ruling that the Estate's evidence sufficiency appeal presents a pure legal issue. It follows that we lack jurisdiction to decide the Estate's appeal and the appeal must be dismissed.

## III.  GAVITT'S APPEAL (No. 15-2434)

### A.  Jurisdiction

Despite our dismissal of the Estate's interlocutory appeal in No. 15-2136, we retain jurisdiction over Gavitt's appeal challenging the dismissals of his claims against the other defendants.  Although the dismissal of claims against some but not all the defendants would not ordinarily constitute a final judgment, the district court has certified all three orders of dismissal that are the subject of this second appeal as a final judgment under Fed. R. Civ. 54(b).  The district court specifically certified that there is no just reason for delay of appeal.  Yet, again, although the certification has not been challenged, the court must still satisfy itself that the certification was proper.  Otherwise, appellate jurisdiction is lacking.  *Lowery v. Fed. Express Corp.*, 426 F.3d 817, 820 (6th Cir. 2005).

The Rule 54(b) certification mechanism is designed to "'strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties.'"  *Id.* (quoting *Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 60 (6th Cir. 1986)).  The district court's certification is comprised of two components:  entry of final judgment as to one or more but fewer than all of the claims or parties; and determination that there is no just reason for delay.  The first component is reviewed de novo; the second for abuse of discretion.  *Id.* at 821.

As to the first component, considering the grounds on which the district court dismissed the claims against most defendants, the dismissed claims are distinctly separable from the unresolved claim against the Estate in that they involve separate actions taken by different actors with different roles in Gavitt's criminal case than the role played by DeVries as a lab technician.  In other words, they involve separate claims based on different "operative facts."  *See id.*  In this regard, we find no error in the court's denominating the dismissals as "final."  That is, irrespective of how the record might develop in further proceedings on the unresolved claim against the Estate, we foresee no grounds on which the dismissals of claims against other defendants—which ultimately remain undisturbed in this appeal—would be subject to reopening.

The second component—no just reason for delay—required the district court to consider the interests of judicial administration as well as the equities of the parties. *Id.* In reviewing for abuse of discretion, the appellate court does not reweigh the equities or reassess the facts, but ensures that the lower court's weighing of interests was sound and supported by the record. *Id.* Relevant considerations are:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like.

*Id.* at 821–22 (quoting *Gen. Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1030 (6th Cir. 1994)).

Review of the district court's certification order discloses no abuse of discretion. The court appropriately considered the relationship between the dismissed claims and the unresolved claim against the Estate. The court also acknowledged the importance of judicial economy, recognizing that the Estate's interlocutory appeal created an opportunity for consolidated appellate review of the dismissals of related claims stemming from the same alleged civil rights violations. Considering that the actions complained of occurred over 30 years ago, the "no just reason for delay" consideration is infused with a certain exigency. Any step that potentially moves the parties closer to a fair and final adjudication is a good step.

Accordingly, we uphold the district court's certification and determine that we have jurisdiction to decide Gavitt's appeal.

**B. Standard of Review**

At issue in this appeal are three rulings by the district court, all issued on December 15, 2014: (1) Opinion and Order Granting Defendants Fatchett's and Kalman's Motion to Dismiss, R. 65, Page ID 2330; (2) Opinion and Order Granting Motion to Dismiss or for Summary Judgment Filed by Defendants Ionia County, Gary M. Gabry, Raymond P. Voet, Ronald J.

Schafer, and Gail Benda, R. 67, Page ID 2379; and (3) Opinion and Order Granting Defendants City of Ionia's, Kenneth Voet's, and Randall Klein's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment, R. 68, Page ID 2417.[3]

Each of the rulings, under Fed. R. Civ. P. 12(b)(6) and 12(c), is reviewed de novo under the same general standards. *STEW Farm, Ltd. v. Nat. Res. Conservation Serv.*, 767 F.3d 554, 558 (6th Cir. 2014). The complaint is viewed in the light most favorable to Gavitt; the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in his favor. *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008). However, "a legal conclusion couched as a factual allegation" need not be accepted as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Gavitt's obligation to provide the "grounds" for the claimed entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. The factual allegations must "raise a right to relief above the speculative level." *Id*. The complaint must state a claim that is plausible on its face, i.e., the court must be able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

Assessment of the facial sufficiency of the complaint must ordinarily be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). If a court does consider material outside the pleadings, the motion to dismiss must be treated as a motion for summary judgment under Rule 56 and all parties must be given a reasonable opportunity to present all material pertinent to the motion. *Id.* However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are

---

[3]The district court adjudicated each of these motions under Fed. R. Civ. P. 12 rather than Fed. R. Civ. P. 56. R. 65, Opinion at 2, Page ID 2331; R. 67, Opinion at 2, Page ID 2380; R. 68, Opinion at 2, Page ID 2418.

referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment. *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015); *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Qualified immunity, if it applies, is a defense not just against liability, but against suit itself. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Hence, the immunity questions should be resolved as early in the litigation as possible. *Id.* Yet, if the qualified immunity questions presented are fact-intensive, the record may not be adequately developed to evaluate the defense at the pleading stage under Rule 12(b)(6). *See Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015).

Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* The court must therefore determine (1) whether the facts alleged by the plaintiff make out the violation of a constitutional right and (2) whether the right at issue was "clearly established" at the time of the alleged violation. *Pearson*, 555 U.S. at 232. "The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citing *Pearson*, 555 U.S. at 236). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

Since defendants raised the qualified immunity defense, Gavitt bears the burden of showing that defendants are not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). At the pleading stage, this burden is carried by alleging facts making out a plausible claim that defendants' conduct violated a constitutional right that was clearly established at the time of the violation. *Id.* To satisfy this requirement, the right allegedly violated must have been clearly established in a "particularized" sense, such that a reasonable official confronted with the same situation would have known that his actions would be in

violation of that right. *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004); *Johnson*, 790 F.3d at 653. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (observing that "bare allegations . . . should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery.")).

### C. Count II Claim for Intentional Misrepresentation of Evidence (Against Defendants Fatchett and Kalman)

In his complaint, Gavitt asserted various civil rights claims against numerous persons involved in the prosecution of the criminal charges against him. Count I of his original complaint asserted a claim for misrepresentation of evidence exclusively against John E. DeVries, deceased, a former Michigan State Police forensic lab technician. That claim, later embodied in an amended complaint, is the subject of appeal No. 15-2136, addressed above. Count II sets forth a civil rights claim under 42 U.S.C. § 1983 for intentional misrepresentation of evidence against former Michigan State Police Detectives John P. Fatchett and John J. Kalman, Jr., who participated in the investigation of the house fire. Fatchett and Kalman moved to dismiss the claim under Rule 12(b)(6) and the district court granted the motion. On appeal, Gavitt maintains that the dismissal was premature.

Count II alleges that Fatchett and Kalman misrepresented evidence in reports and testimony, resulting in a denial of due process and contributing to Gavitt's wrongful conviction and imprisonment. R. 1, Complaint at 41–42, Page ID 41–42. In essence, the claim is that Fatchett and Kalman misrepresented that "they had considered and excluded all accidental causes of the house fire, when in fact they had not even attempted to consider and eliminate all accidental causes of the house fire before they erroneously presumed that the fire was caused by incendiary means." *Id.* at 41, Page ID 41. To the extent this claim implicates testimony given by the officers in Gavitt's preliminary examination and trial, the district court held that Fatchett and Kalman are entitled to absolute immunity, citing *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009). Gavitt does not challenge this part of the ruling.

To the extent Count II can be construed as alleging that defendants Fatchett and Kalman violated Gavitt's due process rights by continuously failing to correct their misrepresentation during the 26-year period of his wrongful imprisonment, the district court viewed the allegations as a claim for post-conviction failure to disclose exculpatory evidence (i.e., *Brady* materials). The court held that due process does not impose on the prosecution a post-conviction obligation to disclose exculpatory evidence, citing *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 68–69 (2009). Gavitt has not challenged this part of the ruling.

Finally, the district court construed Count II as challenging the adequacy of defendants Fatchett's and Kalman's pretrial fire investigation, i.e., their failure to consider and eliminate *all* possible accidental causes of the house fire before investigating for arson. The district court held that such a claim does not make out a violation of a clearly established constitutional right and held that defendants are entitled to qualified immunity. The court relied on *Yancey v. Carroll Cty., Ky.*, 876 F.2d 1238, 1245 (6th Cir. 1989) (holding that officers were entitled to rely on the judicial officer's finding of probable cause in issuing the search warrant unless they knowingly made false statements to obtain the warrant, and that a challenge to the adequacy of the officer's investigation does not rise to level of clearly established constitutional violation); and *Buchanan v. Metz*, 6 F. Supp. 3d 730, 757–59 (E.D. Mich. 2014) (holding that the Sixth Circuit, like most circuits, has not recognized a substantive due process claim based on an inadequate investigation); and *Latta v. Chapala*, 221 F. App'x 443, 444–45 (7th Cir. 2007) (holding that there is no constitutional duty to do a better investigation and that a decision not to conduct a more thorough investigation does not invade an accused's rights).

Gavitt does not challenge the above authorities, but argues that the district court mischaracterized his claim. He emphasizes that Count II complains not that the investigation was not adequate, but that defendants, in their investigative report, falsely represented that it was adequate. This alleged misrepresentation of the completeness of their investigation is said to support Gavitt's claim that Fatchett and Kalman are liable for contributing to the denial of his due process rights. In support, Gavitt cites *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (knowingly falsifying material facts necessary to establish probable cause to prosecute innocent person is unconstitutional); *Hinchman v. Moore*, 312 F.3d 198, 205–06 (6th Cir. 2002) (same);

and *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence affected the decision of the jury).

The specific alleged misrepresentation must be considered in context. The representation Gavitt focuses on appears in Kalman's March 1985 investigation report:

> D/SGT. JOHN FATCHETT and undersigned officer, after observing the damage to the residence and eliminating *all* accidental and natural causes, centered the investigation to the living room area of the residence.

R. 31-5, Kalman Report at 5, Page ID 890 (emphasis added). Gavitt now focuses on the word "all" and contends the statement is inaccurate. That is, because we now know that methods of fire investigation used in 1985 sometimes produced unreliable and misleading results, as they did in Gavitt's trial (i.e., the erroneous conclusion that an accelerant was used to start the fire), Gavitt infers that Fatchett's and Kalman's examination of accidental and natural causes must not have been complete. Gavitt alleges that Fatchett and Kalman "had not even attempted to consider and eliminate all accidental causes of the house fire before they erroneously presumed that the fire was caused by incendiary means." R. 1, Complaint at 41, Page ID 41. Because Gavitt has alleged that defendants intentionally misrepresented the completeness of their investigation, he contends his allegations pass muster under Rule 12(b)(6) and he is entitled to discovery.

The above quoted statement appears at the top of page 5 of Kalman's report, which originally consisted of eleven pages, and was later supplemented with eight more pages of additional findings as the investigation continued.[4] The statement appears immediately after three full pages of single-spaced text detailing the officers' inspection of the Gavitt residence the day after the house fire—including the construction, ventilating system, electrical service, appliances, exterior condition, and interior observations. In other words, the summary statement indicating that Fatchett and Kalman had observed the damage to the residence and eliminated all accidental and natural causes did not stand alone; it was a summary of three pages of findings.

---

[4]Gavitt does not contest defendants' position that the public record compiled in state court when he sought relief from judgment is properly considered part of his complaint for purposes of evaluating the complaint under Rule 12(b)(6). *See Bassett*, 528 F.3d at 430.

Further, the summary statement was not provided to explain, as Gavitt alleges, "why they erroneously presumed that the fire was caused by incendiary means," but rather why their investigation turned to examination of the burn patterns in the living room. It was the examination of the living room burn patterns that led Kalman to preliminarily conclude (as of the date of the original report) that "the origin of the fire was in the middle of the living room and because of the spread of a flammable liquid, it fed back into the hallway." R. 31-5, Kalman Report at 5–6, Page ID 890–91. The investigation remained ongoing. *Id.* at 11, Page ID 896. Kalman's preliminary opinion later found additional support in flame spread tests conducted on March 22, 1985 in the Michigan State Police lab (finding that living room carpet samples ignited and burned longer after gasoline was added), *see id.* at 12–14, Page ID 897–99, and in the chromatographic test results reported in John DeVries' April 4, 1985 lab report (finding living room carpet samples contained residues of highly evaporated gasoline), *see* R. 89-3, DeVries Lab Report, Page ID 2757.

Reading the one-sentence statement at the heart of this claim in context rather than in isolation thus undermines the implied allegation that Kalman's statement that he and Fatchett "eliminated all accidental and natural causes" was a statement of "material" fact necessary to Gavitt's prosecution and conviction. That is, the statement described one preliminary step in the investigation that led to further investigation of the cause of the fire. The continuing investigation yielded other evidence tending to support the conclusion that the fire was intentionally caused with use of a liquid accelerant. Even if the statement were shown to be false, and even if it were shown to have been made by Kalman with knowledge that he and Fatchett had not actually eliminated *every* possible accidental cause of the fire before investigating the possibility of arson, the notion that this statement, in a preliminary report, apart from the testimony and physical evidence presented at trial, played such a material role in the jury's verdict as to make out a denial of due process is simply not plausible. *See Iqbal*, 556 U.S. at 678–79. Gavitt's obligation to provide the "grounds" for the claimed entitlement to relief "requires more than labels and conclusions;" the factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Moreover, the conclusion that Gavitt's reliance on a single arguably inaccurate statement in a 19-page investigation report is too speculative to be actionable as a due process violation is corroborated by other items in the public record. The expert affidavits that supported Gavitt's own motion for relief from judgment in state court (summarized above at 5–9) acknowledge that defendants' flawed investigation and erroneous interpretation of the physical evidence were not the product of intentional wrongdoing, but of a mistaken understanding consistent with the then-accepted fire investigation standards.

Indeed, the affidavits of Gavitt's own experts John Lentini and James Churchwell are telling. Describing the quality of fire investigation methods in 1985, Lentini characterized them as "inconsistent and largely unscientific." R. 31-2, Lentini Aff. at ¶ 15, Page ID 678. Lentini acknowledged that "the State's witnesses may have believed they were testifying truthfully," *id.* at ¶ 27, Page ID 682, and he characterized their conclusions, reviewed under today's standards, as "false and misleading, albeit without malicious intent," R. 31-3, Lentini Aff. at ¶ 70, Page ID 713. Lentini also acknowledged that the gas chromatography testing method used in 1985, the same technology used in Lentini's own laboratory at that time, provided "far less information" than the technology typically used today. *Id.* at ¶ 83, Page ID 720. He viewed the fire investigators' manner of conducting "flame test experiments" as demonstrating "their complete lack of understanding of post-flashover fire behavior"—flashover being a concept that was not generally accepted until the 1990s. *Id.* at ¶¶ 91–92, Page ID 724.

Churchwell said he was in "100 percent" agreement with Lentini's affidavit. R. 31-3, Churchwell Aff. at ¶ 9, Page ID 859. And Churchwell, like Lentini, characterized the conclusions drawn by the prosecution's fire investigators as a mistake: "As cautious and careful as I always try to be, I would likely have made the same mistake upon seeing the Gavitt fire scene in 1986: Fire investigators simply did not have enough knowledge about the true nature of enclosed (compartment) fires at that time." *Id.* at ¶ 12, Page ID 861.

Thus, the assessment of Gavitt's own experts clearly indicates that defendants Fatchett's and Kalman's investigation of the house fire was not inconsistent with the generally accepted fire investigation methods and standards of the time. Their description of the investigation, viewed

in the light most favorable to Gavitt, might be viewed as supporting, at worst, an inference of negligence, but falls far short of suggesting intentional or reckless misrepresentation.

To withstand scrutiny under Rule 12(b)(6), the complaint must state a claim that is *plausible* on its face, not merely possible. This means that the court must be able to draw a reasonable inference that defendants are liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678. While Count II of Gavitt's complaint facially alleges that defendants Kalman and Fatchett knowingly misrepresented the adequacy of their investigation, it does not contain factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, the facts alleged stop short of the line between possibility and plausibility. Further, the public record implicated by the claim, which is appropriately considered under Rule 12(b)(6) based on Gavitt's reference thereto in his complaint, *see Bassett*, 528 F.3d at 430, tends to undermine the reasonableness of any inference that defendants knowingly made any material misrepresentation. Because Gavitt's complaint, viewed in conjunction with the public record, does not include "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claimed constitutional violation, it fails to meet the plausibility standard. *See Twombly* 550 U.S. at 556.

In granting Fatchett's and Kalman's motion to dismiss, the district court cited *Latta v. Chapala*, a Seventh Circuit case affirming the dismissal of similar civil rights claims stemming from what was later revealed to be a flawed arson investigation. After observing that "there is no constitutional duty to 'do a better investigation,'" the court made the following remarks that are no less fitting in this case:

> We acknowledge that the methods that arson investigators used in the 1980s and 1990s have come under challenge; most experts today would use different approaches and therefore could reach different conclusions. . . . Using the methods of the 1980s during the 1980s does not violate the Constitution. The criminal process, like other human endeavors, is imperfect. Science is imperfect too; techniques of arson investigation and analysis have advanced a good deal in the years since the fire at the Lattas' home. Perhaps an injustice has been done, as the Lattas ardently maintain. Section 1983 does not, however, supply monetary damages for every conviction that with the benefit of hindsight seems weaker to the federal judiciary than it did to the prosecutor, jury, and state judiciary.

*Latta*, 221 F. App'x at 444–45.

Gavitt's Count II claim against defendants Fatchett and Kalman suffers from the same infirmities as the claim addressed by the Seventh Circuit in *Latta*. Gavitt has failed to allege facts that raise the right to relief for denial of due process above the speculative level. It follows that Gavitt has not stated a plausible claim of entitlement to relief and that defendants' motion to dismiss Count II was properly granted.

### D. Count III Claim for Conspiracy to Violate Due Process Rights (Against Defendants Gabry, Voet, Klein, Kalman and Fatchett)

In Count III, Gavitt asserts a claim against former Ionia County Prosecutor Gary M. Gabry, two former City of Ionia Police Officers, Police Chief Kenneth E. Voet and Sgt. Randall W. Klein, and Michigan State Police Detectives Fatchett and Kalman. Based on a meeting of these five defendants on March 12, 1985, referred to as a "skull session," Gavitt alleges they conspired to deny him due process. Specifically, he alleges "they all mutually agreed, without any judicial review, laboratory analysis, scientific basis, or reasonable belief, and in willful and wanton disregard for the truth," that the house fire was set by him. R. 1, Complaint ¶ 234, Page ID 43. The district court identified various deficiencies in this claim and dismissed it as to all five defendants.

In evaluating the district court's rulings on the conspiracy claim, we note that the object of the allegedly unlawful conspiracy revolves largely around defendants' reliance on evidence they allegedly *knew* to be false, but evidence which, as seen above, was generally considered to be reliable under fire investigation standards generally accepted in the 1980s, as acknowledged by Gavitt's own experts.

#### 1. *Prosecutor Gabry*

The district court undertook a lengthy analysis of Gabry's entitlement to absolute immunity. Insofar as Count III can be construed as complaining of conduct with functional ties to the judicial process, the court held that Gabry is absolutely immune, citing *Koubriti v. Convertino*, 593 F.3d 459, 467–68 (6th Cir. 2010). Specifically, Gabry was held to be immune from liability for knowing use of false testimony and non-disclosure of exculpatory information in judicial proceedings. Gavitt has not challenged this ruling.

Insofar as Count III can be construed as alleging a conspiracy to refrain from disclosing exculpatory evidence after Gavitt's conviction, the court held there is no such post-conviction disclosure obligation, citing *Osborne*, 557 U.S. at 68–69. Gavitt has not challenged this part of the ruling.

To the extent Count III alleges that Gabry's participation in the March 12, 1985 "skull session" evidences involvement in an investigatory conspiracy, the district court recognized that prosecutorial immunity does not apply. But the court held that no valid claim was stated against Gabry based on the same authorities (*Yancey*, *Buchanan* and *Latta*) and the same reasoning that it applied to the intentional misrepresentation claim against Fatchett and Kalman, addressed *supra* at 21–22. Gavitt challenges this part of the ruling only by arguing that absolute prosecutorial immunity does not apply to Gabry's affording of legal advice to the police, citing *Koubriti*, 593 F.3d at 467, and that his allegations are sufficient to warrant discovery.

Again, Gavitt's argument is off target and unavailing. For the reasons set forth above at pp. 22–27, the claim that Gabry conspired with Fatchett and Kalman on March 12 to investigate the possibility that the house fire was caused by arson does not state a plausible claim for conspiracy to violate Gavitt's civil rights. Again, the extant evidence, from the public record and Gavitt's own experts, supports the conclusion only that the decision to investigate potential non-accidental causes of the fire was based on Fatchett's and Kalman's inspection of the premises and their observations of the burn patterns in the house. While their investigation and interpretation of their findings now appear to have been flawed, they also appear to have been consistent with generally accepted methods and standards at the time. The notion that Gabry participated in a nefarious plot to intentionally subvert justice finds no support in the extant record. Gavitt's arguments about potential incriminating fruits of discovery are too speculative to justify disturbing the dismissal of this claim against Gabry.

### 2. *Fatchett and Kalman*

The district court dismissed the Count III conspiracy claim against Fatchett and Kalman on much the same grounds that applied to the claim against Gabry. R. 65, Opinion at 20–24,

Page ID 2349–53.  One aspect of its ruling, as challenged by Gavitt on appeal, deserves additional attention.

To the extent Fatchett and Kalman are alleged to have conspired with Gabry to not disclose exculpatory evidence (e.g., evidence that the Michigan State Police crime lab had experienced contamination of fire debris samples and false-positive arson test results, *see* R. 1, Complaint at 44, Page ID 44), the district court held the allegations failed to make out a violation of a duty that Fatchett and Kalman owed to Gavitt.  Citing *D'Ambrosio v. Marino*, 747 F.3d 378, 389–90 (6th Cir. 2014), the court held that the duty to disclose exculpatory evidence rests with the prosecutor.  Fatchett and Kalman would have fulfilled their obligation, the court held, by disclosing apparently exculpatory evidence to Gabry.  *See D'Ambrosio*, 747 F.3d at 389–90.  The court noted that *if* Fatchett and Kalman had, as alleged, conspired with Gabry not to disclose such evidence to Gavitt, they must necessarily have disclosed their knowledge of the evidence to Gabry, thereby satisfying their duty under *Brady*.  Accordingly, the court held that Gavitt had failed, in this regard, to state a plausible conspiracy claim against Fatchett and Kalman.

Gavitt contends the district court erred in this ruling.  He insists that *D'Ambrosio* says nothing about the officers' liability for *conspiracy*.  If Fatchett and Kalman conspired with Gabry to suppress the exculpatory evidence and Gabry in fact failed to disclose the evidence to the defense in Gavitt's trial, the argument goes, then even though Gabry would be protected from liability for the nondisclosure by prosecutorial immunity, Gabry and the officers could be liable for their unlawful pretrial conspiracy.

Yet, even if Gavitt's logic holds up, the requisite fact allegations are lacking.  While Gavitt alleged that defendants agreed to conceal the exculpatory evidence at the skull session, he has included no specific factual support for the allegation.  "Although circumstantial evidence may prove a conspiracy, '[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.'"  *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011) (quoting *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)).  This pleading standard is "relatively strict."  *Id.* (quoting *Feiger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008)).  The factual allegations underlying Gavitt's § 1983 conspiracy claim are no

more specific than his allegations made in support of other claims that have already been deemed insufficient to state a plausible claim for relief under the *Twombly/Iqbal* pleading requirements. Because the factual allegations in the conspiracy claim against Fatchett and Kalman are similarly deficient, it was also properly dismissed.

### 3. *Voet and Klein*

The Count III conspiracy claim against defendants Voet and Klein was dismissed by the district court for reasons indistinguishable from those applicable to the same claim against Fatchett and Kalman. And for the reasons discussed above, the dismissal of the conspiracy claim against Voet and Klein must also be upheld. Accordingly, we affirm the district court's dismissal of the Count III conspiracy claim against all five defendants.

### E. Count IV Claim for Failure to Disclose Exculpatory Evidence (Against All MSP Defendants)

In Count IV, Gavitt alleged that the Michigan State Police defendants withheld material exculpatory evidence (e.g., evidence that the MSP crime lab had experienced false-positive and other unreliable arson test results, *see* R. 1, Complaint at 45, Page ID 45) at the time of his trial and throughout the period of his imprisonment, in violation of his due process rights. The district court dismissed this claim, citing *D'Ambrosio*, 747 F.3d 389–90, for the proposition that these particular defendants satisfied *their* duty insofar as the evidence was impliedly (by virtue of Gavitt's Count III conspiracy claim) disclosed to Prosecutor Gabry, and citing *Osborne*, 557 U.S. at 68–69, for the proposition that there is no post-conviction disclosure obligation.

Gavitt challenges this ruling as to defendants Fatchett and Kalman, contending that dismissal is premature and that the district court failed to view the allegations in the light most favorable to him. Yet, again, Gavitt has failed to identify specific factual support for the argument that the defendants "potentially failed" to share the exculpatory evidence with Gabry. His claim of entitlement to relief on this basis thus remains speculative and insufficiently supported to withstand the defendants' motion to dismiss.

Nor is Gavitt's attempt to narrow the holding of *Osborne* persuasive. In *Osborne*, 557 U.S. at 68, the Supreme Court noted that "nothing in our precedents" suggests that the

prosecutor's obligation to disclose *Brady* material to the defendant before trial continues after the defendant is convicted and the case is closed. Gavitt has failed to cite any contrary authority. To the extent due process *could* be deemed to include such an obligation, it is not yet a matter of clearly established law and defendants are entitled to qualified immunity. It follows that the district court did not err by dismissing Count IV.

### F. Counts VI and VII Claims for Municipal Liability (Against Gabry, Ionia County and City of Ionia)[5]

In Counts VI and VII, Gavitt alleged that Ionia County and the City of Ionia are liable for the actions of defendants Prosecutor Gabry (and his successors) and Police Chief Voet (and his successors), whose actions as final decision makers and official policy makers for the County and City, respectively, were taken pursuant to official policies, practices or customs, and violated Gavitt's civil rights. The district court dismissed these claims. The court held that Gabry and his successors, as county prosecutors enforcing criminal laws on behalf of the State of Michigan, are entitled to Eleventh Amendment immunity for actions brought against them in their official capacity, citing *Cady v. Arenac Cty.*, 574 F.3d 334, 342–43 (6th Cir. 2009). The court also held that Ionia County is not liable for actions allegedly taken by Gabry and his successors in a particular prosecution because Gavitt did not allege that such actions were taken pursuant to a policy attributable to the County, citing *D'Ambrosio*, 747 F.3d 387–88. Finally, the court dismissed the claim against the City of Ionia on the grounds that Gavitt had failed to allege facts establishing a causal link between the alleged violation of his due process rights and any policy, practice, or custom of the City, citing *Bright v. Gallia Cty., Ohio*, 753 F.3d 639, 660 (6th Cir. 2014).

Gavitt challenges these rulings on various grounds. Yet, to survive a motion to dismiss, a § 1983 claim for municipal liability based on actions taken pursuant to official policy, practice or custom must include adequate allegations "(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Id*. at 660. Based on the analysis set forth above, it is now clear that Gavitt has failed to meet the first of these three elements because he has failed to

---

[5]Gavitt has not challenged the dismissal of his Count V claim in this appeal.

allege a plausible claim for violation of his due process rights by the individual defendants. Accordingly, the Count VI and VII official-capacity and municipal-liability claims were also properly dismissed.

### G. Wrap-Up

At this point, there can be no doubt that David Gavitt was convicted and imprisoned based on evidence now known to be unreliable. While Gavitt, with hindsight, may seem to have been "wronged," he has failed to allege sufficiently specific facts to support his claims that any of the defendants-appellees in this case acted with such culpable state of mind as to warrant relief under § 1983. Due process guarantees a right to a fair trial, not perfection. *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. 2000). As the Seventh Circuit observed in *Latta v. Chapala*, "[u]sing the methods of the 1980s during the 1980s does not violate the Constitution." 221 F. App'x at 445. The district court employed similar reasoning in concluding that defendants are entitled to qualified immunity. The above analysis confirms the appropriateness of all dismissals challenged in this appeal, No. 15-2434.

## IV. CONCLUSION

In sum, the appeal presented in Case No. 15-2136, challenging the denial of the motion to dismiss the amended complaint against the Estate of DeVries, is **DISMISSED** for lack of appellate jurisdiction. As to the appeal presented in Case No. 15-2434, the district court's judgment dismissing all claims against the remaining defendants is **AFFIRMED**.