NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0381n.06

**No. 19-6009**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 26, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DAMAYANTI BANERJEE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| THE UNIVERSITY OF TENNESSEE, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: BOGGS, GRIFFIN, and LARSEN, Circuit Judges.

BOGGS, Circuit Judge. As a tenure-track assistant professor at the University of Tennessee, Knoxville ("UTK"), Dr. Damayanti Banerjee knew she had to publish or perish. She failed to publish, so she perished. Unhappy with being denied tenure, she then brought a lawsuit, raising claims of Family and Medical Leave Act (FMLA) retaliation and racial and national-origin discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964. The district court granted judgment on the pleadings for the University on some grounds and summary judgment on others. Banerjee appeals. She also appeals the district court's denial of leave to amend her complaint. While this case is factually and procedurally complicated, the end conclusion is simple: none of Banerjee's arguments, whether procedural or substantive, have merit. We affirm the district court.

**FACTUAL AND PROCEDURAL HISTORY**

Damayanti Banerjee is a female sociologist who was born in India. On August 1, 2008 she began work as an assistant professor at the University of Tennessee's sociology department in a tenure-track position. After multiple warnings over several years that her published work was not adequate, the university elected in 2014 not to retain her, and on July 31, 2015, her employment ended. Dr. Banerjee now makes a number of claims regarding her employment. We set out the facts as pertinent below.

**Facts Regarding FMLA Claims:** Banerjee was pregnant when she was hired, and three months later, on October 30, 2008, she gave birth to a daughter. Banerjee alleges that she asked then-department head Scott Frey for FMLA leave around that time and was denied. Banerjee claims she had to "work right up to the time of her daughter's birth[.]"A colleague did, however, teach her class for two weeks. That spring (i.e., spring 2009), Banerjee asked Frey to help her deal with issues she was having with her babysitter by scheduling her classes for late morning or the afternoon; he scheduled her to teach two classes, each on Tuesday and Thursday, starting at 8 AM and 11 AM respectively.

**Racial and National-Origin Discrimination:** Banerjee claims that "[t]hroughout her employment at the University," coworkers made "denigrating comments toward her and comments about other foreign-born faculty and staff in her presence." She alleges that colleagues would frequently mock the accents of foreign faculty and comment on how easy it was for Indian and Chinese academics, in particular, to acquire the degrees and credentials they had gained in their home countries. And an "influential colleague" told Banerjee that she should focus on "library work" or on India, "since she was incapable of the depth of understanding of the United States necessary for field work."

**Banerjee's Retention Reviews:** Banerjee underwent annual retention review six times during her employment at UTK. Even non-tenured UTK professors enjoy a significant amount of protection in their employment. Tenure-track professors are reviewed in the first instance by the tenured faculty of their department. Then the recommendation of this committee is forwarded to the department head, who reviews it and makes his or her own recommendation on retention. These two reports then go to the dean, who adds a third report and forwards everything to the provost, who has final say.

Banerjee's first review, in fall 2008, shortly after she started work at UTK, was uneventful, and the sociology faculty voted unanimously in favor of retention. But starting in 2009, the process grew rougher each year. In 2009, the faculty committee, while unanimously voting for retention, expressed concerns with Banerjee's slow rate of publication. In 2010, a minority of the faculty committee voted against retention, citing the same concern.

The next year, Banerjee was very nearly fired. The faculty committee voted 6-2 against retention, with two abstentions, noting that her writing output fell below departmental standards. Banerjee had not published any peer-reviewed articles since arriving at UTK.[1] The department head likewise recommended against her retention. This recommendation then went to the Associate Dean of Personnel for the College of Arts & Sciences, Dr. John Zomchick. In a written response to the department head's recommendation, Banerjee argued that her lack of production was due to "conflicting feedbacks on what would be construed as appropriate output by the department" and "the birth of my daughter in the fall of 2008." As UTK points out, this means that "[s]he blamed her lack of productivity in 2011 on her lack of leave in Fall 2008." Zomchick recommended against Banerjee's retention. This report was then sent to the provost, Dr. Susan

---

[1] She had published one book review, which per faculty bylaw did not count as much as an article. The faculty noted that Banerjee did have articles written and under consideration, or in various stages of completion, at the time.

Martin, to whom Banerjee also submitted a written response. Martin overruled the previous three levels of faculty review, allowing Banerjee to stay. In doing so, she wrote:

> While there is significant evidence to suggest that you do need to improve in teaching and research, I am also very concerned that you apparently did not receive opportunities for leave and/or modified duties during your pregnancy that, according to Provost's office policies, would normally be accorded [to] probationary faculty. . . .
>
> I strongly suggest that you work with the department head to secure a supportive mentor and develop a detailed plan to guide your activities through the coming year.

Banerjee lived to fight another day.

In 2012, the faculty committee again voted against retention 5-3, with one abstention. The faculty noted that Dr. Banerjee had published two articles since the last review but expressed concern that one of the two was in a low-impact journal. The department head this time, however, recommended retention in light of the progress Banerjee had made, though expressing similar concerns about her recent output and future potential for tenure. The next two levels of officials similarly agreed that Banerjee should be retained but warned that her work needed substantial improvement. Banerjee was retained.

Banerjee's final retention review came in fall 2013. The faculty noted that that year, Banerjee had published three peer-reviewed articles, as against the departmental standard of two per year. On the other hand, the bulk of the review was deeply negative. Banerjee's work was described as "weak and highly redundant." There was a consensus that "her work has not moved beyond her dissertation research" and that her "work does not significantly contribute to or advance the field." As to the recent written work, while one article was in a "respected specialty journal[,]" on the other hand, the "[e]nvironmental faculty had not heard of the journal *Environmental Justice* and noted that these two articles are each four printed pages . . . ." The department noted that for a tenure-track professor of six years' seniority, 12 publications would be the expected output,

4

whereas Banerjee had "published five peer-reviewed publications and a review essay." Moreover, "[s]he ha[d] conducted no new research since arriving at UT."

By a vote of 5-2, with two abstentions, the faculty committee voted against retention. The department head likewise recommended against retention, as did the Dean of the College of Arts & Sciences. Each made similar comments about the quality of Banerjee's scholarship and expressed serious doubts that she would make a suitable candidate for tenure. The provost decided that the university would not retain Banerjee. On February 4, 2014, Provost Martin wrote to Banerjee letting her know of this decision, and on June 12, 2014, Martin followed up her earlier memorandum with a formal notification. As per usual practice, Banerjee was given a year to make other arrangements, and on July 31, 2015, her employment with the university came to an end.

After she had been informed that she would not be granted tenure, but before the end of her employment, Dr. Banerjee launched two internal appeals. First, she appealed to the Faculty Senate Appeals Committee, which declined to act.[2] Then, on July 13, 2015, she appealed by letter to the University Chancellor. Discovery showed that the Chancellor asked for advice from Dr. Zomchick on how to handle the response. The Chancellor ultimately determined, as he wrote on December 30, 2015, that he had found "no basis on which to overturn the academic judgment of your departmental peers, your departmental head, the dean, and the Provost[.]"

On September 4, 2015, Banerjee filed a Charge of Discrimination with the EEOC. UTK states in its brief that "[o]n November 30, 2016, the EEOC dismissed the complaint[,]" but it provides no citation for this assertion.

---

[2] Banerjee says the Appeals Committee "took no action," while UTK describes it as having "denied her appeal." Of the two characterizations, UTK's is closer to the truth: the Appeals Committee decided formally "to take no action on the grounds that the appeal lacks merit for consideration and/or lies outside the scope of the committee," and it notified Banerjee of this decision by letter.

**The Lawsuit:** Banerjee initially filed suit in the Middle District of Tennessee, on January 3, 2017. On March 10, 2017, UTK moved to transfer venue to the Eastern District of Tennessee. This motion was granted on November 30, 2017. The case had a somewhat tortuous procedural history.[3] But the dispositive rulings that are now on appeal are as follows. On January 16, 2019, the court granted the University's motion for judgment on the pleadings as to Banerjee's FMLA claim and denied Banerjee's motion to amend the pleadings. Then on August 6, 2019, the district court granted summary judgment in favor of UTK on the remaining claims, namely Banerjee's Title VII hostile-work-environment and discrimination claims.

Banerjee now appeals (1) the district court's grant of judgment on the pleadings as to her FMLA-retaliation claim; (2) its denial of her motion for leave to amend the pleadings; and its grant of summary judgment to the University on her (3) Title VII discrimination and (4) harassment claims.

---

[3] There is one aspect to which Banerjee draws repeated attention in her briefs, despite the fact that, strictly speaking, it is not on review today: that, as she puts it, UTK's "Answer had been filed nearly twenty-one months after the Complaint had been served upon the Defendant." This arose, however, not out of neglect of the litigation as a whole, but through an odd quirk in the defendant's motion to transfer, which also moved to dismiss on Eleventh Amendment grounds some of the plaintiff's claims. The order granting the transfer did not rule on this part of the defendant's motion one way or the other, and the University appears to have considered it still pending. As Judge Mattice later explained in a ruling denying a default judgment to Banerjee, normally:

> [F]iling a partial motion to dismiss tolls the time within which a defendant must answer. Defendant's responsive pleading was therefore not due until after the resolution of its partial motion to dismiss.
>
> However, . . . . [i]n both the motion and the memorandum in support, Defendant requested that the Court transfer the case, and "[i]f the Court declines to transfer the case, Defendant respectfully requests that this Court dismiss Plaintiff's claims under Tennessee law with prejudice." Partial dismissal was, for whatever reason, requested in the alternative. The Motion to Transfer was therefore disposed of in its entirety by the Memorandum Opinion and Order entered on November 30, 2017. Accordingly, Defendant was required to serve a responsive pleading "within 14 days after notice of the court's action" on the Motion to Transfer. Fed. R. Civ. P. 12(a)(4)(A).

Therefore, UTK technically *was* over a year and a half late in filing its Answer. However, the judge found that there had been no bad faith, that UTK (and Banerjee) had actively been litigating the case and proceeding toward trial, and that under such circumstances, default judgment or deeming the allegations admitted would be an unnecessarily drastic remedy. He therefore granted UTK leave to file an Answer and some extended time in which to do so, and in turn granted Banerjee an extension of the discovery period.

**STANDARD OF REVIEW**

We review the following *de novo*:

- The district court's grant, under Fed. R. Civ. P. 12(b)(6), of a motion to dismiss. *Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016); *Wee Child Care Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 846 (6th Cir. 2012).

- The district court's grant, under Fed. R. Civ. P. 12(c), of judgment on the pleadings. *Gavitt*, 835 F.3d at 639; *Wee Child Care*, 680 F.3d at 846.

- The district court's grant, under Fed. R. Civ. P. 56, of summary judgment. *Int'l. Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).

We review for an abuse of discretion the district court's denial of a motion under Fed. R. Civ. P. 15(a) to amend the pleadings, unless the motion was denied for futility, in which case we review *de novo*. *United States v. Gibson*, 424 F. App'x 461, 464–65 (6th Cir. 2011).

**ANALYSIS**

**I.  FMLA-Retaliation Claim**

Banerjee brings a claim for retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, on the grounds that the University refused to renew her contract, in part, "because of her requests for Family Medical Leave" and "because she continually complained about the denial of FMLA leave." The two incidents that provide the basis for this claim are her request for maternity leave in Fall 2008, and her request for a more flexible class schedule in Spring 2009, to help with childcare. *See* 29 U.S.C. § 2612(a)(1) (guaranteeing "eligible employees" 12 weeks of unpaid leave per "because of the birth of a . . . daughter and in order to care for such . . . daughter"). Banerjee made these requests in her first year at UTK, before she had been at the University for more than a year, and thus before she became "eligible" for leave under the FMLA. *Id.* § 2611(2)(A) (defining "eligible employee" as "an employee who has been

7

employed . . . for at least 12 months by the employer with respect to whom leave is requested . . . ."). It is well established in this circuit that if one is not eligible for FMLA leave, one cannot maintain a cause of action for FMLA retaliation. *See Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 354 (6th Cir. 2008) ("To the extent that [plaintiff] is claiming that she was terminated because of her attempt to obtain FMLA leave in January of 2005, her claim must fail as a matter of law because she was not eligible for FMLA benefits . . . ."); *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). And Banerjee cites no authority to the contrary.

Rather, she makes a frivolous pleading-standard argument. According to Banerjee, the fact that her complaint pleads that she "sought FMLA leave at least twice during her employment with [the University]" means that we should construe her complaint liberally to imply that there were some other, unnamed times when she *was* a qualified employee, sought leave, and was retaliated against. She attempts to bolster this argument by pointing to places in the complaint that allege "multiple requests/complaints about FMLA leave" or speak of "requests for FMLA leave" in the plural. But it is clear in the context of her complaint what Banerjee is talking about:

> 238. Dr. Banerjee sought FMLA leave at least twice during her employment with Defendant.
>
> 239. She first sought FMLA during Fall 2008 and was denied this leave.
>
> 240. She also sought FMLA leave during Spring 2009, in the form of intermittent leave or a reduced teaching schedule that would allow her to breastfeed her newborn daughter.

The complaint continues after these paragraphs with other statements that are *not* instances of Banerjee requesting FMLA leave. In context, then, her allegation that she "sought FMLA leave at least twice" refers to these two instances. To infer the existence of any others, without additional alleged facts, would be the type of "speculative" interpretation of pleadings that *Bell Atlantic Corp.*

8

*v. Twombly* rejects. 550 U.S. 554, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Banerjee does not—and by all appearances, cannot—provide specifics about any other occasion that would provide a basis for her FMLA-retaliation complaint.[4] Accordingly, her FMLA-retaliation claim fails.

## II. Denial of Motion to Amend

Banerjee moved for leave to file an amended complaint on November 8, 2018. As UTK notes, this was after her deposition and only twenty days before the end of the discovery period. By the time the district court ruled on the motion, on January 16, 2019, discovery had closed. The district court observed that Banerjee had cast her motion entirely in terms of Rule 15's language that "[t]he court should freely give leave" to amend, without noting either the rest of that sentence ("when justice so requires") or the also-applicable strictures of Rule 16, which instructs that after a scheduling order has been entered, "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 15(a)(2); Fed. R. Civ. Proc. 16(b)(4). The court had set a schedule with a deadline of February 5, 2018 for amendments to the pleadings. Thus, Banerjee had to show good cause to get past the Rule 16 barrier and then also satisfy the "when justice so requires" element of Rule 15(a)(2). To evaluate whether justice so requires, the court must consider, *inter alia*, "undue delay in filing . . . undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005). The district court assumed *arguendo* that Banerjee could show good cause and denied the motion on three grounds: 1) futility; 2) undue delay; and 3) that allowing amendment would prejudice the

---

[4] As opposed to other, later instances of her complaining about it, which clearly did happen but are not what trigger the eligibility requirement. *Cf. Humenny*, 390 F.3d at 905–06 (emphasizing that the question, even in retaliation claims, is whether the employee was eligible when that employee sought leave).

university. Because these grounds are subject to different standards of review, we examine them separately below, after summarizing the proposed amendments.

Substantively, as the district court observed, Banerjee's proposed amendments fell into three categories: "(i) add[ing] a claim under 42 U.S.C. § 1981, (ii) add[ing] equitable estoppel allegations to her FMLA claim, and (iii) clarify[ing] . . . her Title VII claims." The district court correctly observed that the third category consisted of changes that were "are minor and almost entirely composed of legal characterizations." On appeal, both Banerjee and UTK focus on the proposed amendments to the FMLA section of the complaint.[5] Finally, it is noteworthy, before diving into specifics, to observe that Banerjee cites no law in her briefing on the denial of her motion to amend, while providing a misleading account of the record.

### A. Futility

We review *de novo* a district court's denial of a motion under Fed. R. Civ. P. 15(a) to amend the pleadings, if the motion was denied for futility. *See Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010). A motion to amend is futile "where a proposed amendment would not survive a motion to dismiss." *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 383 (6th Cir. 1993).

In evaluating the proposed amendments to the FMLA section, we must first contend with a controversy over what they were designed to accomplish. The district court characterized them as "equitable estoppel allegations," and undertook its futility analysis on that understanding. On appeal, Banerjee protests vigorously that:

> Neither Plaintiff's Motion to Amend nor her proposed Amended Complaint, however, raise this issue. (RE 67 & 67-1.) Contrary to the court's assertion, Plaintiff advances no new theory of equitable estoppel in her proposed amendments. Only

---

[5] Banerjee concedes on appeal that the proposed § 1981 claim is barred by the Eleventh Amendment.

later, in Plaintiff's Response to Defendant's Motion for Judgment on the Pleadings, does she address the issue in any way. (RE 68.)

Consequently, it was entirely inappropriate to deny Plaintiff's motion to amend on this ground.

This is grossly misleading. A quick look at the proposed amendments shows that they could only be designed to support an equitable estoppel claim:

244. Defendant's faculty employee handbook provides FMLA leave to employees who are nine month employees.

245. Defendant failed to qualify the grant of FMLA leave to nine-month employees as stated in faculty handbook.

246. Plaintiff reasonably relied on the representations in Defendant's faculty handbook, when she sought maternity leave, reduced teaching schedule to allow her to care for and/or breastfeed her infant child, and later sought reset of her tenure clock because Defendant denied her FMLA leave.

247. Not only did Dr. Banerjee forgo her right to FMLA leave, as provided in the faculty handbook, but Sociology faculty, including Department Head Schefner, her faculty mentor Dr. Gellert, and the John Zomchick, acting on behalf of the University denied her the opportunity to reset her tenure clock in-light of improper denial of FMLA leave.

Moreover, Banerjee herself later stated in her Response in Opposition to Defendant's Motion for Judgment on the Pleadings that, "[i]n her *Proposed* Amended Complaint, Plaintiff has stated a claim for FMLA retaliation based on equitable estoppel[.]"

Once it is clear that the proposed amendments go to an equitable-estoppel theory, it also clear that they are futile. Equitable estoppel is available in certain circumstances to FMLA plaintiffs, "preventing the employer from raising non-eligibility as a defense[.]" *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009). However, for equitable estoppel to apply, the plaintiff must show: "(1) a definite misrepresentation as to a material fact, (2) a reasonable reliance on the misrepresentation, and (3) a resulting detriment to the party reasonably relying on the misrepresentation." *Ibid*. The UTK faculty employment handbook that Banerjee argues she

relied on is full of statements that would make reasonable reliance impossible.[6] For instance, the beginning of the chapter on benefits warns that:

> The following sections are intended as *a general summary* of the most important benefits and leaves of absence and are provided for information purposes and *are not a promise that any particular benefit or leave request will be granted*.

(Emphasis added.) In light of this, it is perhaps not surprising that Banerjee now disavows her equitable-estoppel theory and argues instead that she never propounded such a theory in the first place. Neither argument is sustainable, and the amendments that go to Banerjee's FMLA claims clearly are futile.

### B. Undue Delay and Prejudice to the University

As to her other proposed amendments, Banerjee argues that these were "minor" and therefore were not futile. Whatever else one might say about that argument, it makes it very hard to argue that the judge abused his discretion in denying such "minor" changes. *See Colvin*, 605 F.3d 282.

Banerjee argued below and argues before us that the University's long delay in submitting an Answer (*see supra*, n.3.) somehow either necessitated her own relatively late-in-the-day motion to amend, or meant that it should be allowed for reasons of fairness, or both. But a complicated case-management problem like the one that was presented here is exactly what district judges are trusted to handle. Judge Mattice's solution was a reasonable one, even if it was not the one Banerjee would have preferred. The district court was under no compulsion to link the two issues. Meanwhile, the court correctly concluded that Banerjee herself had unduly delayed proposing her amendments and that the University would suffer prejudice if the court allowed plaintiff to amend

---

[6] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

her complaint. Therefore, insofar as any of Banerjee's proposed amendments are not covered by our affirmance on futility grounds, we affirm them on the ground that the district court did not abuse its discretion.

### III.    Banerjee's Title VII Discrimination Claim Is Time Barred

Banerjee was formally notified that the University had terminated her employment by Provost Martin's letter of June 12, 2014. She did not file her EEOC charge until September 4, 2015. In order to bring a Title VII suit in federal court, a plaintiff must first have filed, within 300 days of the adverse action, a charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). September 4, 2015 is well over 300 days after June 12, 2014. Therefore, Banerjee's claim is time-barred. The district court granted summary judgment to UTK on this ground.

Banerjee argued then and argues now that her use of the internal-appeals process at UTK ought to toll the statute of limitations, particularly as discovery shows that the Chancellor relied on Dr. Zomchick's advice in evaluating her letter of appeal. Dr. Zomchick was "the central figure in Plaintiff's dismissal and the person furthest from being a disinterested party to the matter" and therefore this "represented a continuation of the discriminatory treatment Dr. Banerjee had suffered[.]" This argument suffers from several problems. First, and most significantly, the Supreme Court rejected the argument that use of the internal appeals process at a university should toll the time bar in Title VII cases, in *Delaware State College v. Ricks*. 449 U.S. 257, 261–62 (1980).

In *Ricks*, as in our case, a university professor was denied tenure and given a terminal contract. He received notice of this by formal letter. He initiated an internal appeals process, in which he did not succeed. *Id.* at 253–54. He then filed an EEOC complaint against his college and later sued the college under Title VII. *Id.* at 254. The complaint would have been timely were the

triggering event the end of the university appeals process, but not if it were the formal notification of the denial of tenure. *Id.* at 260–61. Thus, the Supreme Court faced two closely related questions. First, which event marked the start of the 300-day clock for the filing of an EEOC complaint? The Court held that the clock began to run upon the notification by formal letter that Ricks had been denied tenure. *Id.* at 259. Second, given that this was so, did Ricks's internal appeal toll the statute of limitations? The Court held that it did not. *Id.* at 261.

Banerjee attempts to differentiate *Ricks* on the grounds that the *Ricks* court "recognized the validity of the continuing-violation theory, but rejected it only because the plaintiff had presented no 'allegations of facts to support it.'" (Quoting *Ricks*, 449 U.S. at 259.) She claims, by contrast, that she "has presented substantial evidence of continuing discrimination in the appeals process itself, making the *Ricks* holding plainly inapplicable." It is true that dicta in *Ricks* keeps open the possibility that a plaintiff could allege a continuing violation during the appeals process that would extend "the limitations periods to commence with the date of discharge[.]" *Id.* at 258. For the continuing-violation theory to apply, however, *Ricks* specifies that: "[the plaintiff] would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure." *Id.* at 258.[7] Banerjee fails to develop any such argument. Beyond the fact of Dr. Zomchick's involvement in both her dismissal and her appeal, she introduces no evidence or allegations from which we might discern that this process "differed discriminatorily" from the norm.[8] *Ibid*. Nor does she otherwise make out a continuing act of discrimination, other than

---

[7] This statement comes in the context of a discussion of which date triggered the 300-day EEOC requirement, which was the topic of the first half of the opinion, rather than in the context of whether or not the pursuit of the grievance procedure should toll such a statutory limitation. However, the Court's opinion discussing the latter question, which Banerjee cites, refers back to the previous discussion. *See* 449 U.S. at 459.

[8] Banerjee says only that "common sense dictates that delegation of this responsibility to a plainly biased party deprived Dr. Banerjee of the independent review of her appeal to which she was entitled . . . ." But this is not

alleging *ipso facto* that Zomchick was biased because of his involvement in her firing. She presents no cases that bear on what we ought to do with the involvement of Dr. Zomchick in the appeal. Thus, we cannot differentiate *Ricks*.

Moreover, one of the cases that Banerjee cites on the timeliness of her Title VII claim (and she only cites two) actually points another way: to the proposition that, at most, the appeals irregularities might represent a *separate* Title VII claim. In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 116 (2002), the Supreme Court held that:

> Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [The plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

*Id.* at 114. In light of this passage, Banerjee is arguing against her own cause when she writes, "This improper delegation [to Zomchick] was a *separate, independent act* of discrimination, which effectively tolled the statute of limitations period . . . ." (Emphasis added.) If the first half of the sentence is true, *Morgan* suggests the second half must be false. In other words, if Zomchick's involvement in the appeal somehow did give rise to (or constitute) a discriminatory act, that would be at most the basis for a separate Title VII claim—not the one that Banerjee has brought. Ultimately, though, such speculation pales beside the overwhelming similarities between our case and *Ricks*. The district court was right to find Banerjee's claims are time-barred.

---

responsive to the strictures of *Ricks*. Banerjee points to no evidence of what sort, if any, of "independent review" her sending a letter entitled her to, what its processes were supposed to be, whether Dr. Zomchick (who held an academic administration position) was usually involved in such appeals, or whether there was any general due-process guarantee for such an appeal by letter. Absent such a showing, we cannot conclude that there were discriminatory differences of the sort that *Ricks* contemplated.

15

## IV. Title VII Harassment Claim

In order to establish a viable claim of harassment (also referred to as hostile work environment), a plaintiff must show, in relevant part, that the conduct of her coworkers was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).[9] The plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Banerjee's allegations fall short of this standard. Most of the incidents which she cited below as supporting her harassment claim are simply not—even in the light of every favorable inference accorded to the party opposing summary judgment—instances of racial- or national-origin-based comments.[10] Many are bizarre,[11] nonsensical,[12] or petty examples of alleged slights in the groves of academe.[13]

On appeal, Banerjee zeroes in on what she considers to be her best examples:

She was told by her influential colleague Dr. Cable and her husband, a retired faculty member, that she should focus her energies on library work or on India, her country of origin, since she was incapable of the depth of understanding of the United States necessary for field work. (Banerjee Depo., RE 78-1, Page ID ## 599-

---

[9] This is the objective portion of a two-part inquiry that also asks if the "victim . . . subjectively regard[ed] that environment as abusive." *Ibid.* There seems no serious doubt that Banerjee subjectively felt ill-used.

[10] For instance, Banerjee claims that Dr. Jones and Dr. Cable referred to her as a "shirker."

[11] "Dr. Presser referring to Plaintiff's daughter as a 'ghost baby' because Dr. Presser had not seen the baby."

[12] "On November 26, 2013, Plaintiff emailed Dr. Shefner about funding to travel to India for a conference at which she was presenting a paper." Shefner replied, "[w]e can certainly help pay for your December travel," and added "as far as I am concerned, you continue to be a full member of faculty until your departure . . . . I am more than willing to talk about any other issues or resources that make your transition easier." (This email was written after the faculty committee had voted for dismissal.) Banerjee called Shefner unprofessional, and the exchange became heated. As the district court put it, "Plaintiff apparently believes Dr. Shefner assumed she was moving to India," while "[i]n the context of the email, it is clear Dr. Shefner referred only to her transition out of the University."

[13] Examples abound. One of the shorter examples: "At a department party at Dr. Shefner's house, Plaintiff testified Dr. Shefner introduced everyone standing around her to others, but did not introduce her."

16

600.) Dr. Cable and another professor frequently mocked the accents of foreign faculty within Dr. Banerjee's hearing. (*Id.* at 606-09.) Another professor let it be known how easy it was for Indian and Chinese people to get degrees in their home countries, with the clear subtext that Dr. Banerjee's credentials were less significant than they appeared. (*Id.* at 609.)

These three comments are neither sufficiently severe nor sufficiently common to come close to the Title VII harassment standard.

Because this is summary judgment, we infer that all three comments were meant as insulting Banerjee on the grounds of race and/or national origin and were perceived that way. But even taken together, no reasonable juror could find that these incidents sufficed to show that Banerjee's workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (cleaned up). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The comments about library work and about Indian degrees are certainly "isolated incidents." And while making fun of accents is juvenile and unbecoming, it does not, absent further allegations that would allow us to infer particularly aggravating circumstances, rise above "simple teasing." *Cf. Calderon v. Ford Motor Credit Co.*, 300 F. App'x 362, 369–70 (6th Cir. 2008) (denying summary judgment on hostile work environment claim where the evidence showed "a pattern of ridicule and treatment," including coworkers mocking the plaintiff's accent "every time she spoke").

In sum, Banerjee has fallen short of the standard required to make out a Title VII hostile work environment claim. *See Faragher*, 524 U.S. at 788 (The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.") (cleaned up).

## CONCLUSION

For the foregoing reasons, the judgments of the district court are AFFIRMED in their entirety.