RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

FRANK SAVEL, named Plaintiff 1, and NAMED PLAINTIFFS 2–46, on their own behalf and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

THE METROHEALTH SYSTEM,

*Defendant-Appellee*.

⎤
⎟
⎟
⎟
⎟
⎟
⎟ No. 23-3672
⎟
⎟
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:22-cv-02154—James S. Gwin, District Judge.

Argued:  February 1, 2024

Decided and Filed:  March 20, 2024

Before:  SUTTON, Chief Judge; CLAY, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Jon A. Troyer, ARNOLD, GRUBER & HAREN, LTD., Canton, Ohio, for Appellants.  Stephen S. Zashin, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellee.
**ON BRIEF:**  Jon A. Troyer, ARNOLD, GRUBER & HAREN, LTD., Canton, Ohio, for Appellants.  Stephen S. Zashin, Ami J. Patel, Natalie M. Stevens, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellee.

BLOOMEKATZ, J., delivered the opinion of the court in which SUTTON, C.J., and CLAY, J., joined.  SUTTON, C.J. (pp. 14–15), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

BLOOMEKATZ, Circuit Judge. The MetroHealth System, an Ohio hospital, denied all employee requests for religious exemptions from its COVID-19 vaccine mandate. It granted some employee requests for medical exemptions. A little over a month later, MetroHealth changed its mind about the religious exemption requests and granted all of them. Frank Savel, a former MetroHealth employee who resigned shortly after the hospital rejected his religious exemption request, sued MetroHealth for religious discrimination. He argued that the exemption process—especially the blanket denial of religious exemptions—violated Title VII and Ohio Revised Code § 4112. Forty-five other current or former employees joined him. Most still worked at MetroHealth when they filed their complaint, but some had resigned for reasons related to the exemption process.

The district court dismissed the action for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. The court reasoned that the plaintiffs who were still employed at MetroHealth when they filed their complaint had no standing to sue and, in the alternative, that they failed to state claims under Title VII and § 4112. It concluded that the plaintiffs who resigned by the time the complaint was filed did have standing, but that they also failed to state claims under Title VII and § 4112. The plaintiffs appeal, arguing that they have standing and that they stated claims upon which relief can be granted. We affirm as to Plaintiffs 3–46, but we reverse as to Plaintiffs 1 and 2.

**BACKGROUND**

Because this case comes before us on a motion to dismiss, we recite the facts as they are alleged in the complaint. *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). MetroHealth is a county-owned hospital in Cleveland, Ohio. In August 2021, MetroHealth informed its employees that they would need to be fully vaccinated against COVID-19 by October 30, 2021. In its August communication, MetroHealth explained that "those who have underlying health conditions or religious beliefs that preclude them from receiving the vaccination" could apply for

exemptions. Compl., R. 2, PageID 8. It also provided instructions for how to apply. On October 15, 2021, MetroHealth updated its managers on the status of the exemption requests. The hospital noted that it had received hundreds of requests, so it would review them on a rolling basis with decisions made no later than December 31, 2021. In the meantime, employees who had submitted requests and were waiting for an answer were deemed compliant with the vaccine mandate. On December 15, 2021, MetroHealth announced a delay: employees seeking exemptions would not receive an answer until January 31, 2022 at the earliest.

That answer came on February 7, 2022, when MetroHealth categorically denied all the religious exemption requests, whether those requests established a legitimate basis for an exemption or not. The hospital explained that the religious exemption seekers could not fully perform their job duties remotely and no other reasonable accommodation was available. According to MetroHealth, granting the requests would cause the hospital undue hardship. MetroHealth did grant some medical exemption requests.

Initially, MetroHealth told the unsuccessful exemption seekers that they would need to be fully vaccinated within forty-five days of their exemption denial to remain employed, which gave them until March 24. MetroHealth also told them that they could not appeal the decision. But on March 15, 2022, just nine days before the vaccination deadline, MetroHealth reversed its policy. It granted all the religious exemption requests it had previously denied, including those that did not establish a legitimate basis for an exemption. MetroHealth's CEO justified the abrupt change by saying that "the costs and burdens in granting non-medical exemptions have changed in a material way." *Id.* at PageID 15.

Frank Savel, a registered nurse and former employee of MetroHealth, sued the hospital for religious discrimination under Title VII and Ohio Revised Code § 4112 (Ohio's anti-discrimination statute).[1] *See* 42 U.S.C. §§ 2000e–2000e-17; Ohio Rev. Code Ann. § 4112 (West 2023). He had resigned after his religious exemption request was rejected but before MetroHealth reversed its decision. Savel was joined by forty-five other co-plaintiffs in a

---

[1]The complaint also alleged violations of the U.S. and Ohio Constitutions and sought declaratory and injunctive relief to prevent future violations. The district court dismissed the plaintiffs' constitutional claims on mootness and ripeness grounds, and the plaintiffs do not challenge this on appeal.

putative class action.   Most of the plaintiffs—numbers 10 through 46—still worked at MetroHealth when they filed the complaint.  Plaintiffs 1 through 9, including Savel, had already resigned by that time.

MetroHealth filed a motion to dismiss under Rules 12(b)(1) and 12(c).**2**  *See* Fed. R. Civ. P. 12(b)(1), 12(c).  With respect to Rule 12(b)(1), MetroHealth argued that the plaintiffs did not allege sufficient facts to establish standing.  For dismissal under Rule 12(c), MetroHealth argued that the plaintiffs failed to state claims under Title VII and § 4112.

The district court dismissed on all counts.  The court separated the plaintiffs into two groups: those who were still employed at MetroHealth (Plaintiffs 10–46), and those who resigned (Plaintiffs 1–9).  It concluded that the employee plaintiffs lacked standing to bring their Title VII and § 4112 claims because they had not been injured by MetroHealth.  It added that, in the alternative, the employee plaintiffs also failed to state claims under Title VII and § 4112.  The court held that the resignee plaintiffs established standing, but that they too failed to state claims under Title VII and § 4112.**3**  Savel and the forty-five other plaintiffs timely appealed.

## ANALYSIS

### I.  Standard of Review

We review the grant of a motion to dismiss de novo.  *Pedreira v. Ky. Baptist Homes for Child., Inc.*, 579 F.3d 722, 727 (6th Cir. 2009).  We must accept the plausible factual allegations in the complaint as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Gentek Bldg.*

---

**2**Federal Rule of Civil Procedure 12(c) governs motions for judgment on the pleadings. MetroHealth and the district court describe the filing as a motion to dismiss.  A district court can dismiss a complaint on a Rule 12(c) motion for failure to state a claim as it would on a Rule 12(b)(6) motion.  *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012).  For clarity, we refer to MetroHealth's filing as a motion to dismiss.

**3**The district court made two additional holdings that we do not address.  First, the district court rejected MetroHealth's argument that Plaintiffs 3, 9, 12, 14, and 41 were union members who were obligated to use a mandatory grievance process to handle any disputes with their employer.  The district court opted not to dismiss these plaintiffs' claims on that basis and instead dismissed for lack of standing or failure to state a claim.  Second, the district court observed that Plaintiffs 4–9 and 46 had failed to exhaust their administrative remedies, so their claims could be dismissed on that basis as well.  On appeal, the plaintiffs challenge the union membership holding, even though the district court ruled in their favor.  The plaintiffs do not challenge the exhaustion holding.  We do not discuss either of these issues because the twelve plaintiffs affected by them lack standing on other grounds that we must address to resolve all the plaintiffs' standing to sue.

*Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Conclusory statements are not enough. *Twombly*, 550 U.S. at 556. The plaintiff must do more than show "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021) (explaining that the *Twombly/Iqbal* plausibility test applies to motions to dismiss on standing grounds).

## II. Standing

Article III gives us the power to adjudicate "Cases" and "Controversies," not hypothetical disputes. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting U.S. Const. art. III, § 2). To confirm that we are dealing with a genuine case or controversy, we evaluate whether the plaintiff has standing to bring the case. *Id*. at 338. Standing consists of three elements. A plaintiff must allege (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) that the injury is "fairly traceable" to the defendant; and (3) that the injury "is likely to be redressed" if we grant relief. *Id*. at 338–39 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). If the plaintiff fails to satisfy any of the three standing requirements, we have no jurisdiction because there is no case or controversy to decide, and we must dismiss the case. *Lujan*, 504 U.S. at 560.

### A. Standing for Employee Plaintiffs (Plaintiffs 10–46)

At the time the complaint was filed, Plaintiffs 10–46 were still employed by MetroHealth. Because they cannot point to any injury sufficient to establish standing, we affirm the district court's dismissal of their claims.

The employee plaintiffs allege two kinds of injury. The first is retrospective. They say that MetroHealth's exemption process caused them "severe mental anguish" because of the looming threat that they would lose their jobs if their exemption requests were denied and they refused to be vaccinated. *See* Compl., R.2, PageID 37. They explain that their distress was magnified because the process took much longer than MetroHealth initially announced it would. The second kind of injury the employee plaintiffs allege is prospective. They say that MetroHealth did not issue permanent exemptions, so they will have to resubmit requests.

If those future requests are denied, the employee plaintiffs' employment could be in jeopardy all over again.

But neither the retrospective distress nor the possibility of prospective denial amounts to an injury in fact for standing purposes. We recently considered virtually identical injuries against a virtually identical factual backdrop in *Bare v. Cardinal Health, Inc*. No. 22-5557, 2023 WL 395026 (6th Cir. Jan. 25, 2023). The *Bare* plaintiff, on behalf of a putative class, sued his employer for violating Title VII by initially denying him religious exemptions to a COVID-19 vaccination requirement. *Id.* at *1. Like Plaintiffs 10–46 here, the *Bare* named plaintiff claimed that he suffered "mental and emotional anguish" and "anxiety and stress" because he believed he would be forced to choose between his job and his religious beliefs, and because he was allegedly intimidated and harassed for refusing the vaccine. First Am. Compl. at ¶ 8, *Bare v. Cardinal Health, Inc.*, No. 3:21-CV-00389-DCLC-DCP, 2022 WL 702593 (E.D. Tenn. Dec. 3, 2021), 2021 WL 9218573. And like Plaintiffs 10–46, the named plaintiff in *Bare* ultimately received a religious exemption but feared that his employer might not renew it in the future. *Id.* at ¶ 7. We held that the allegations were "too conclusory to establish a cognizable past injury," *Bare*, 2023 WL 395026, at *2, and they are here too. We also explained that Bare's fears about a future denial were "contingent on future events that may never come to pass, which is a much 'too speculative' state of affairs 'to satisfy the well-established requirement that threatened injury must be "certainly impending."'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). The same is true in this case. Accordingly, the employee plaintiffs do not have standing to bring their Title VII and § 4112 claims.

**B. Standing for Resignee Plaintiffs (Plaintiffs 1–9)**

At the time they filed their complaint, Plaintiffs 1 through 9 were no longer employed at MetroHealth because they resigned in response to the vaccine mandate and exemption process. Unlike the employee plaintiffs and the *Bare* plaintiffs, the resignee plaintiffs pointed to their discontinued employment at MetroHealth as another form of injury.

The fact that Plaintiffs 1–9 resigned instead of getting fired complicates our standing analysis. A resignation is presumably voluntary. *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir.

2004). This would ordinarily doom a plaintiff's claim on standing grounds. Whether we frame the standing problem along injury terms, *see, e.g.*, *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 834–35 (6th Cir. 2001), or causation terms, *see, e.g.*, *California v. Texas*, 593 U.S. 659, 669–71 (2021), a person cannot manufacture a case or controversy by acting of their own accord and then blaming someone else for the fallout. *See Clapper*, 568 U.S. at 416.

But sometimes a plaintiff's seemingly voluntary decision is not voluntary at all. If the defendant forced the plaintiff's hand, and the plaintiff was left with no choice but to give up something of value or suffer an unpleasant consequence, we may recognize that the defendant caused the plaintiff an injury. Likewise, it is well-established that a plaintiff who stops exercising their rights because they reasonably fear prosecution does not need to wait to take legal action; the government has already injured them. *See Kiser v. Reitz*, 765 F.3d 601, 609–10 (6th Cir. 2014). Depending on the context, we have identified different telltale signs that a defendant has forced a plaintiff to take some undesirable action such that the plaintiff has standing to sue.

In the employment discrimination context, this concept of forced resignation is called "constructive discharge." *See Green v. Brennan*, 578 U.S. 547, 560 (2016). To separate a constructive discharge from an ordinary resignation, we sometimes ask whether the employer clearly communicated to the plaintiff that they were about to be terminated. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (quotation omitted) ("[C]onstructive discharge also occurs where, based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'"). If they did, we hold the employer legally responsible as though it fired the employee directly. *Id.*; *see also Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). A plausible allegation of constructive discharge satisfies standing requirements because the resulting lost income and benefits form an "injury in fact" that is "fairly traceable" to the employer. *See Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560).

The resignee plaintiffs argue that MetroHealth forced them to resign when it categorically denied all religious exemptions. In the wake of those denials, the resignee plaintiffs say they grappled with the unbearable choice between living according to their religious convictions and keeping their jobs. The resignee plaintiffs also point out that, after denying their requests,

MetroHealth informed them that they would be terminated on a specific date it they remained unvaccinated, so it was "entirely reasonable for them to not wait until actually terminated before seeking other employment." Reply Br., App. R. 19 at 3.

While we recognize that this scenario may establish standing, it only applies to the resignee plaintiffs if they plausibly alleged that MetroHealth forced them to resign. However, the plausibility of the resignee plaintiffs' forced resignation narrative depends on whether and when each person's exemption request was denied. For this reason, we consider the resignee plaintiffs in separate groups.

***Plaintiffs 4–7 and 9***. Plaintiffs 4–7 and 9 resigned after submitting exemption requests, but before those requests were denied. These plaintiffs were never forced to choose between their beliefs and termination. They resigned before they could find out whether MetroHealth might simply grant their requests. They certainly did not know MetroHealth would categorically deny religious exemptions. At the time, MetroHealth had not yet communicated a certain termination date to these employees, because MetroHealth was still processing their requests. These facts do not plausibly support a theory of constructive discharge.

***Plaintiff 8***. Likewise, Plaintiff 8's allegations do not indicate that she was forced to resign. Plaintiff 8 never submitted an exemption request. She never asked her employer for an accommodation to follow her religion, so her employer never had the chance to refuse and set the forced resignation in motion. Nor was she personally affected by the allegedly discriminatory categorical denials, because she did not make any request that could be subject to denial. *Cf. Nunn*, 113 F. App'x at 60 (holding that an employer could not have forced an employee to resign if the employee resigned "after the cause of the difficult working conditions had left"). And Plaintiff 8's vague allegations that she was discouraged from applying are not sufficient to transform her presumably voluntary resignation into a forced resignation, especially given that the plaintiffs tell us MetroHealth actively solicited religious exemption requests.

***Plaintiff 3***. Plaintiff 3 also failed to plausibly allege that MetroHealth forced him to resign. As best we can tell from the pleadings, Plaintiff 3 resigned sometime after submitting an exemption request, but he provides us with no additional information about the timeline.

Without additional facts, it is impossible for us to know whether he resigned before MetroHealth denied his request (as did Plaintiffs 4–7 and 9), after MetroHealth denied his request and before it changed course, or after MetroHealth ultimately granted his request. It is conceivable that Plaintiff 3 resigned at a time that is consistent with a forced resignation theory, but he pleaded no facts that "nudged [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. And since Plaintiff 3 has not plausibly alleged constructive discharge, he has no standing.

*Plaintiffs 1 and 2.* Out of the nine resignee plaintiffs, only the first two remain. Their allegations differ from the rest in an important way: Plaintiffs 1 and 2 say they resigned after MetroHealth denied their requests, but before MetroHealth changed its mind and decided to grant all the religious exemptions. This means that MetroHealth placed Plaintiffs 1 and 2 in the difficult position of choosing between following their religion and keeping their jobs. MetroHealth told them that they could not appeal the denial and that their employment would be terminated if they did not get fully vaccinated within forty-five days. These facts are adequate to support a theory of forced resignation sufficient to establish standing at this stage.

In contrast, the district court concluded that Plaintiffs 1 and 2 had not plausibly alleged constructive discharge. The court reasoned that Plaintiffs 1 and 2 had "received notice of [their] employer's intent to commence a process that could lead to [their] discharge," Op., R. 23, PageID 1013 (quoting *Wright v. Ill. Dep't of Child & Fam. Servs.*, 798 F.3d 513, 530 (7th Cir. 2015)), but they resigned "with a substantial amount of time remaining on their grace period," so they could not claim that MetroHealth forced their hand. *Id*. at PageID 1014.

But the forty-five-day window was not an uncertain process that may or may not end in discharge. The plaintiffs alleged that MetroHealth had already announced its decision at the start of that period. MetroHealth also foreclosed any possibility of appeal. According to the plaintiffs, MetroHealth gave no indication that it would reconsider the denials during the forty-five days. When the grace period was more than halfway over and MetroHealth still had not signaled that things might change, Plaintiffs 1 and 2 left. These facts plausibly allege that MetroHealth communicated to Plaintiffs 1 and 2 that they would be terminated after forty-five days if they refused to be vaccinated on religious grounds. It is possible that Plaintiffs 1 and 2

may lack standing at a later phase of this litigation based on additional evidence about the certainty of termination. But plausibility is all that is required at this stage, and "a well-pleaded complaint may proceed even if it strikes a savvy judge . . . 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Plaintiffs 1 and 2 have plausibly pleaded that MetroHealth forced them to resign, so they have standing to sue MetroHealth. We therefore consider the merits of their claims.

## III. Failure to State a Claim

Plaintiffs 1 and 2 have pleaded facts sufficient to state a violation of Title VII. And because employment discrimination claims under the Ohio discrimination statute mirror employment discrimination claims under Title VII, Plaintiffs 1 and 2 have also stated claims under Ohio Revised Code § 4112. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003).

Title VII of the Civil Rights Act protects employees from religious discrimination and requires employers to reasonably accommodate employees' religious beliefs, assuming the accommodation does not cause the employer undue hardship. 42 U.S.C. §§ 2000e-2(a), 2000e(j). Plaintiffs 1 and 2 allege MetroHealth failed to accommodate their religious beliefs by blanket-denying their vaccine exemption requests. They also assert that MetroHealth treated them differently because of their religion. The district court held that the plaintiffs failed to sufficiently plead either violation.[4] We disagree.

We recently explained in *Charlton-Perkins v. University of Cincinnati* that a plaintiff seeking to state a gender-based employment discrimination claim under Title VII "only needed to plead sufficient facts from which [the court] could plausibly conclude that defendants failed to

---

[4]The district court called the two Title VII claims "religious accommodation" and "religious discrimination." Op., R. 23, PageID 1005. It did so based on our precedent. *Tepper v. Potter*, 505 F.3d 508, 513, 515 (6th Cir. 2007). But failing to accommodate the religious needs of an employee is itself a kind of religious discrimination. *See id*. at 513–14; *Bolden v. Lowes Home Ctrs., LLC*, 783 F. App'x 589, 593–97 (6th Cir. 2019). The Supreme Court describes the religious discrimination claims available under Title VII slightly differently by creating only two categories—disparate treatment and disparate impact—and sorting religious accommodation claims under the disparate treatment umbrella. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 771–73 (2015). For clarity, we refer to the two claims at issue in this complaint as "failure-to-accommodate" and "disparate treatment." *See Reed v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 569 F.3d 576, 579 (6th Cir. 2009).

hire him because of his gender." 35 F.4th 1053, 1060–61 (6th Cir. 2022). Likewise, Plaintiffs 1 and 2 just need to plausibly allege that they were denied a religious accommodation and treated differently because of their religion. "If a reasonable court can draw the necessary inference [of discrimination] from the factual material stated in the complaint, the plausibility standard has been satisfied." *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012). After all, "'plausibility' occupies that wide space between 'possibility' and 'probability.'" *Id*. (quoting *Iqbal*, 556 U.S. at 678).

A plaintiff does not have to allege specific facts establishing a prima facie case of discrimination in their complaint. In *Swierkiewicz v. Sorema N.A.*, the Supreme Court announced this rule, clarifying that the prima facie case is "an evidentiary standard, not a pleading requirement." 534 U.S. 506, 510 (2002). The rule survived the heightened pleading standard ushered in by *Twombly* and *Iqbal*. *See Twombly*, 550 U.S. 569–70; *Keys*, 684 F.3d at 609. We have at times strayed from the *Swierkiewicz* rule. *See, e.g.*, *Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363 (6th Cir. 2015). But those departures were not permanent. Our recent precedent confirms that *Swierkiewicz* controls. *See Charlton-Perkins*, 35 F.4th at 1060 (reiterating that "plaintiffs are not required to *plead* facts establishing a prima facie case." (quotation omitted)); *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 842 (6th Cir. 2024).

### A.  Title VII Failure-to-Accommodate Claim

Plaintiffs 1 and 2 plausibly pleaded that MetroHealth failed to make reasonable accommodations for their religious practices. Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . [the] religious observance or practice without undue hardship on the conduct of the employer's business." *Id*. § 2000e(j). The heart of the failure-to-accommodate claim is that an employer discharges (or otherwise discriminates against) an employee for failing a job-related requirement instead of

abiding by its "statutory obligation to make reasonable accommodation for the religious observances" of its employees. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977).

Applying this statutory language to the facts of this case, Plaintiffs 1 and 2 have plausibly pleaded that MetroHealth failed to give them a reasonable accommodation by denying their requests for a religious exemption to its vaccine mandate. They also claim that they were forced to resign, (in other words, they were constructively discharged) "because of" their "religion," including their "religious practice" of refusing the COVID-19 vaccine because it was created in a way that violates their religious "belief." 42 U.S.C. § 2000e-2(a), (j). A constructive discharge is the same as an ordinary discharge "for remedial purposes," *Suders*, 542 U.S. at 141, so it is covered by Title VII. In total, these allegations are enough under *Charlton-Perkins* to state a claim.

The district court reached the opposite conclusion, and in doing so, it erred in two ways. First, the district court required the plaintiffs to plead the elements of a prima facie case of failure-to-accommodate to successfully state their claim. But that is not the appropriate standard at the pleading stage, so we do not apply it here. Second, the district court reasoned that Plaintiffs 1 and 2 did not plausibly plead constructive discharge, but for the reasons we explained above, they did.

## B. Title VII Disparate Treatment Claim

Plaintiffs 1 and 2 also plausibly alleged that MetroHealth treated them differently from other employees by forcing them to resign because of their religion. That is the basic claim contemplated by the text of Title VII, 42 U.S.C. § 2000e-2(a), which prohibits employers from "discriminat[ing] against any individual" with respect to the "terms, conditions, or privileges of employment, because of [their] . . . religion." *Id.* Plaintiffs 1 and 2 alleged that MetroHealth categorically denied all religious exemption requests while granting some nonreligious exemption requests—that is, that MetroHealth treated them differently with respect to a condition of employment because of their religion. As in *Keys v. Humana*, which also evaluated a disparate treatment claim at the pleading stage, the complaint's allegations "are neither speculative nor conclusory," and they state a plausible claim by detailing a "specific event[]"

where Plaintiffs 1 and 2 were "treated differently" than their nonreligious "counterparts." *See* 684 F.3d at 610. These allegations allow a court to "draw the reasonable inference" that Plaintiffs 1 and 2 were discriminated against due to their religion. *See id.* (quoting *Iqbal,* 556 U.S. at 678).

As with the failure-to-accommodate claim, the district court prematurely applied the prima facie case requirements to the disparate treatment claim and found it lacking. The district court expected too much of Plaintiffs 1 and 2 at this early stage. Time—and, crucially, discovery—will tell whether Plaintiffs 1 and 2 satisfy the prima facie case requirements. The district court may ultimately be right that they cannot make that showing. But at the pleading stage, it is too soon to consider that question.

**CONCLUSION**

For the foregoing reasons, we affirm the district court's judgment as to Plaintiffs 3–46 but reverse and remand for further proceedings as to Plaintiffs 1 and 2.

_____

**CONCURRENCE**

_____

SUTTON, Chief Judge, concurring.   I join the majority's thoughtful and thorough opinion in full, and add these two cents to make one modest point:  Is it better to think about the predicament facing Plaintiffs 1 and 2 as a constructive discharge or as a run-of-the-mine adverse employment action?  I am not sure.  When these claimants sought an exemption, MetroHealth denied it.  The hospital then gave them a choice:  get the vaccine or get fired on March 24. Making matters worse for the claimants, the hospital told them that it would not reconsider its decision.  Whether the source of the claimed discrimination is race, gender, or faith, a claimant in this situation need not wait until the ax falls on March 24 to sue.

Surely Plaintiffs 1 and 2, for example, could have filed an injunction action against the hospital to prevent the firing, say ten to twenty days before March 24.  Article III would not stand in the way.  Neither would Title VII.  *See* 42 U.S.C. § 2000e-5(g)(1) (permitting injunctive relief for employers who have "intentionally engaged in or [are] intentionally engaging in an unlawful employment practice").  But in that setting, would we think of the action as a lawsuit to prevent a constructive discharge?  That is an odd way to think of the claim.  There is nothing constructive about what would happen on March 24.  It seems more like an action to prevent an allegedly unlawful "discharge . . . because of [an] individual's . . . religion."  *Id.* § 2000e-2(a)(1).

What if Plaintiffs 1 and 2, after seeing the writing on the wall, got jobs elsewhere?  What if those jobs required them to start a few weeks before March 24?  And what if they left MetroHealth voluntarily before March 24?  Would that end the lawsuit?  Doubtful.  Their departure might affect the damages calculation, but it would not prohibit a damages action.  In that setting, the claimants would have faced not just a constructive discharge but an actual—and imminent—discharge.  The concept of constructive discharge, it's true, has parallels to today's situation.  But its roots in hostile-work-environment claims make me wonder whether we would better off using "adverse employment action" to describe today's case.  Either way, it makes no difference in the outcome.  Even if we concluded that MetroHealth did not constructively

discharge Plaintiffs 1 and 2, their all-too-real impending discharge would suffice to move their claims forward.