RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

LAURIE ANN DEVORE,

                *Plaintiff-Appellant*,

    *v.*

UNIVERSITY OF KENTUCKY BOARD OF TRUSTEES,

                *Defendant-Appellee*.

No. 23-5890

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:22-cv-00186—Gregory F. Van Tatenhove, District Judge.

Argued:  June 25, 2024

Decided and Filed:  October 11, 2024

Before:  WHITE, STRANCH, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:**  Anthony J. Bucher, GATLIN VOELKER, PLLC, Covington, Kentucky, for Appellant.  Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Appellee.  **ON BRIEF:**  Anthony J. Bucher, GATLIN VOELKER, PLLC, Covington, Kentucky, for Appellant.  Bryan H. Beauman, Savannah G. Baker, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, William E. Thro, UNIVERSITY OF KENTUCKY, Lexington, Kentucky, for Appellee.

─────────────

## OPINION

─────────────

JANE B. STRANCH, Circuit Judge.  Laurie DeVore retired from her post at the University of Kentucky rather than comply with its COVID-19 test-or-vaccinate policy.

She then filed this lawsuit, alleging that the Policy conflicted with her sincerely held religious beliefs and that the University's failure to accommodate those beliefs violated Title VII of the Civil Rights Act of 1964. The district court granted summary judgment for the University. We **AFFIRM**.

## I. BACKGROUND

Laurie DeVore worked for the University of Kentucky from 1999 to 2022. She started as a part-time employee and ultimately became a department manager in the Office for Policy Studies on Violence Against Women, or "the Office." DeVore performed successfully throughout her tenure at the University, but began clashing with the school over return-to-campus policies it implemented in the wake of the COVID-19 pandemic. The University transitioned to remote operations at the onset of the pandemic, functioning remotely for over a year. It then announced in June 2021 that classes would return to campus for the 2021-2022 academic year. This announcement, and the policies and procedures the University would later implement alongside it, prompted DeVore to submit a series of requests seeking to be excused from the University's return-to-campus protocols.

### A. DeVore's Hybrid Work Request

On June 21, 2021, the University informed employees that it would be "returning to normal operations" with "health, safety and well-being" serving as a "governing priority." It directed employees with "a disability or a documented health risk" to file a "Request for Reasonable Accommodation" with the University's Office of Institutional Equity and Equal Opportunity. It also invited employees to submit requests for hybrid or remote work schedules that would be evaluated case-by-case.

DeVore requested a hybrid work arrangement in response to this announcement, asking for a weekly schedule of three days in-office and two days at-home. The request explained that DeVore's job involved "times of high stress and long hours" and that a "hybrid work format would ensure a considerable reduction of that stress as well as peace of mind." It added that a "hybrid work arrangement" would also "be beneficial" for her and the Office because it would offer her "uninterrupted time to focus" on the detail-oriented elements of her job. The University

denied DeVore's request, determining that all department managers would be expected "on campus full-time and in-person beginning in August" 2021, subject to "specific health and safety concerns."

### B. DeVore's Religious Exemption Requests

The University supplemented its return-to-campus announcement with an August notice laying out the safety protocols that would accompany its return to on-campus operations. The University adopted a test-or-vaccinate policy—"the Policy"—mandating weekly COVID testing for unvaccinated faculty, staff, and students. The Policy required unvaccinated campus patrons to undergo testing "on a weekly basis" but excused those who were "fully vaccinated" from regular testing.

DeVore submitted a series of requests seeking a religious exemption from the test-or-vaccinate policy. She emailed her first exemption request to the University on October 1, 2021. The email explained that DeVore was unvaccinated and that to comply with the Policy she would have to "obtain weekly COVID-19 PCR testing until I accept the vaccination." She represented that, "My sincere religious beliefs require that I refuse to accept the vaccine which would mean subjecting myself to regular, repeated medical interventions against my will, that are not without risks to my person, in order to coerce me into doing something I simply cannot do." She concluded by stating, "I am sending this email to request a religious exemption." The University denied the request.

DeVore sent a second request on October 4, 2021, reiterating her appeal for a religious exemption and attaching a memorandum explaining her objection to the Policy. The memo articulated DeVore's belief that the testing requirement was designed to coerce unvaccinated employees into accepting the vaccine, relayed medical data from the Centers for Disease Control and Prevention and the Food and Drug Administration on vaccine efficacy, and explained that she would not provide informed consent to participate in COVID testing. DeVore emphasized that COVID testing imposed "potential" health and safety risks, and protested that the University had not disclosed whether PCR testing caused "shortness of breath, headaches, nausea, respiratory irritation, perforation of the thin membrane that separates the sinus cavity from the

brain cavity, and wounds and inflammation of the nasal passage which would compromise a person's first line of defense against viruses, bacteria, fungi, etc." The University again denied DeVore's request.

DeVore emailed a third exemption request on October 8, 2021, once more supported by a memorandum discussing her position on the Policy. This memo focused on the Policy's failure to adequately solicit informed consent from campus patrons subject to the University's testing requirements. It described COVID testing as "medical experimentation," characterizing it as conscripting human research subjects into participating in a medical experiment without consent. It referenced a variety of University, federal, and international standards that, in DeVore's view, mandatory COVID testing violated. The University denied DeVore's request for a third time.

### C. DeVore's Religious Accommodation Request

Following the University's categorical denial of her religious exemption requests, DeVore submitted a religious accommodation request and filed a complaint of religious discrimination. DeVore's accommodation request sought an "accommodation due to a conflict between" her "religious beliefs" and her "work." It explained that "God expects me to honor Him by taking care of my person to the best of my ability" and that the "COVID-19 vaccines and the repeated testing medical procedures, go against my sincerely held beliefs." It requested a fully remote work schedule to accommodate this conflict. The corresponding complaint asserted that denying her relief from the test-or-vaccinate policy amounted to religious discrimination.

The University's Office of Institutional Equity and Equal Opportunity opened a case to assess DeVore's accommodation request and accompanying discrimination complaint. The investigation included interviews conducted by one of the University's Title IX coordinators with an assistant dean at the University, DeVore's supervisor in the Office, and DeVore herself. DeVore also provided a supplemental memorandum as part of the investigation that aggregated her prior objections to the Policy. The University concluded its investigation by denying DeVore's request and issuing a letter directing DeVore to begin complying with the Policy. The letter also clarified that DeVore could comply with the Policy through oral swab or saliva testing in lieu of the nasal swab tests to which she had previously objected.

DeVore responded with an email explaining that the alternative testing methods would not resolve her religious conflicts with the Policy.  She asserted that oral swab and saliva testing were "not reasonable in light of my religious concerns."  The University replied, explaining that it had understood DeVore's testing objections to be specific to the invasive nature of the nasal swab test and that it had offered the alternative testing options to remedy that objection.  It concluded that, nonetheless, the University could not accommodate DeVore's request and again instructed DeVore to comply with the Policy.

The University's characterization of DeVore's COVID testing objection prompted another response from DeVore.  DeVore accused the University of deliberately misconstruing her requests and reiterated her position that the Policy was a form of coercion.  The University responded again, thanking DeVore for offering clarification but confirming that it did not change the University's conclusion that her request could not be accommodated.  The University invited DeVore to "apply for a remote work position with the University" if she continued to object to its on-campus requirements.

**D.  Procedural History**

DeVore did not apply for another position with the University but instead continued working in the Office while violating the Policy.  Over the following weeks, the University issued DeVore four notices of noncompliance.  The fourth notice informed DeVore that she would be placed on a period of unpaid administrative leave until she adhered to the Policy.  DeVore declined to comply with the Policy during the leave period, and the University ultimately notified her that she would be terminated as a result.  The notification also informed DeVore that she met the criteria for retiring from the University and that, should she do so, she would "be separated in good standing" and eligible to receive any corresponding benefits.  DeVore elected this option and retired in January 2022.

Six months after retiring, DeVore filed this lawsuit, charging the University with failing to accommodate her religious beliefs in violation of Title VII of the Civil Rights Act.  After a period of discovery, the parties cross-moved for summary judgment.  DeVore attached no sworn testimony of her own to support her motion for summary judgment or oppose the University's,

relying exclusively on the testimony of others and on her previous correspondence with the school.  The district court granted the University's motion and denied DeVore's.  DeVore appeals the portion of the court's order granting the University's motion.

## II.  LEGAL STANDARD

A district court's grant of a motion for summary judgment is reviewed de novo.  *Tepper v. Potter*, 505 F.3d 508, 513 (6th Cir. 2007).  Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if, taking the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Parties must go "beyond the pleadings" in advancing, or defending against, a summary judgment motion.  10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2721 (4th ed. June 2024 Update).  Movant and opponent alike "must support their factual positions either by directing the court's attention to materials in the record or by showing that the cited materials do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce any admissible evidence to support the fact."  *Id.*; *see Viet v. Le*, 951 F.3d 818, 822–23 (6th Cir. 2020).  "Conclusory statements unadorned with supporting facts" will not do.  *Viet*, 951 F.3d at 823 (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).  "Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage."  *Id.* (citations omitted).  Ultimately, the court must "examine the pleadings to ascertain what issues of fact they present and then consider the affidavits, depositions, admissions, interrogatory answers and similar material to determine whether any of those issues are real and genuine."  Wright & Miller, *supra*, § 2721.

## III.  ANALYSIS

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer" to "discriminate against" a covered employee because of the employee's religion.

42 U.S.C. § 2000e-2(a).  To comply with the Act, an employer must "reasonably accommodate" an employee's "religious observance" and "practice" unless doing so would impose an "undue hardship on the conduct of the employer's business."  *Id.* § 2000e(j).

Claims under these provisions are, at the summary judgment stage, analyzed in two steps. At the first step, the employee must establish a prima facie case of religious discrimination. *Tepper*, 505 F.3d at 514.  The employee does so by demonstrating that (1) the employee has "a sincere religious belief that conflicts with an employment requirement;" (2) the employer was on notice "about the conflicts;" and (3) the employee "was discharged or disciplined for failing to comply with the conflicting employment requirement."  *Id.*  At the second step, the employer must show that accommodating the employee's religion would impose an undue hardship.  *Id.* The employer does so by demonstrating that the accommodation would impose a "substantial" burden "in the context of [the] employer's business."  *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). The only element of the prima facie case at issue here is whether DeVore has established that the Policy conflicts with her sincere religious beliefs.

Title VII protects "all aspects of religious observance and practice[.]"  *Lucky v. Landmark Med. of Michigan, P.C.*, 103 F.4th 1241, 1243 (6th Cir. 2024) (quoting *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771-72 (2015)).  Its coverage attaches to practices rooted in "religious principle," but not to purely secular beliefs, such as those that are "essentially political, sociological, or philosophical," a matter of personal preference, or the product of "a merely personal moral code."  *Welsh v. United States*, 398 U.S. 333, 342–43 (1970) (plurality opinion) (quoting *United States v. Seeger*, 380 U.S. 163, 172 (1965)) (Universal Military Training and Service Act); *see Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (Religious Land Use and Institutionalized Persons Act of 2000); *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) (First Amendment); *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 587 (6th Cir. 2018) (Religious Freedom Restoration Act).[1]  A religious belief "need not be acceptable, logical,

---

[1]*See also* U.S. E.E.O.C., *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* § L.2 (last updated May 15, 2023) ("Title VII does not protect social, political, or economic views or personal preferences.  Thus, objections to a COVID-19 vaccination requirement that are purely based on social, political, or economic views or personal preferences, or any other nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs, practices, or observances under Title VII."); *accord Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 492 (3d Cir. 2017).

consistent, or comprehensible to others in order to merit" protection, and Title VII is agnostic to the reasonableness "of the particular belief or practice in question." *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). The judicial task in assessing evidence of a religious conflict is narrow, but courts must nevertheless ensure the asserted conflict is "sincerely based on a religious belief," rather than "some other motivation," *Holt*, 574 U.S. at 360–61, and that the belief actually conflicts with a workplace policy, *New Doe Child #1*, 891 F.3d at 587.

DeVore asserts a conflict between her sincerely held religious beliefs and the University's "requirement that on-campus employees either get the Covid vaccine or submit to weekly mandatory Covid testing." The University's default testing protocol used nasal polymerase chain reaction, or nasal "PCR," COVID tests. DeVore's religious discrimination complaint, however, prompted the University to clarify that DeVore could comply with the Policy using "an oral swab test or a saliva test." DeVore's prima facie case must therefore establish a religious conflict with each of the testing options the University offered—nasal, oral swab, and saliva.

DeVore relies almost exclusively on email communications with the University to make her case. Most of DeVore's emails relay objections to the nasal test and were sent before the University explained that DeVore could comply with the Policy through other testing mechanisms. *See* R. 22-11, 10/4/21 Email, PageID 369 (highlighting risk of "inflammation of the nasal passage"); R. 22-13, 10/8/21 Email, PageID 373 (objecting to "screening for COVID-19 through a nasopharyngeal swab"); R. 22-16, 10/15/21 Email, PageID 382 (incorporating previous objections); R. 22-20, Title IX Memo, PageID 398 (asserting that "repeated testing can damage the first line of defense God created mankind with").

Two of DeVore's emails did, however, respond to the University's clarification with objections to the oral swab and saliva tests. The first referred the University to the objections DeVore had provided in her Title IX memorandum, objections she maintained still applied, and the second quoted the same objections—neither email introduced any new source of religious conflict. *See* R. 22-20, PageID 398 (summarizing objections to Policy); R. 22-23, DeVore 11/4/21 Email, PageID 407 (referring to prior objections); R. 22-27, DeVore 11/15/21 Email, PageID 418 (quoting prior objections). The Title IX memorandum, now serving as the source of

DeVore's religious objections to oral swab and saliva testing, raised three distinct conflicts between DeVore's religion and the Policy: the Policy was (1) invasive, (2) manipulative, and (3) coercive.

DeVore's first objection to the Policy was that the invasiveness of the University's testing procedures interfered with her religious obligation to treat her body as a "temple."  She explained that "repeated testing can damage the first line of defense God created mankind with and could provoke immediate or long-term health issues, putting a healthy person without symptoms at risk.  That probability increases every time it is performed."  DeVore later acknowledged in her deposition, however, that there "was no invasiveness regarding the saliva test" and that she did not "know what was entailed in . . . the oral swab" test, admitting that she did not "research what the oral swab test entailed."  Given these concessions, DeVore has established no conflict between the Policy and any religious objections she may have to invasive medical procedures.

DeVore also objected to the Policy on the alternative basis that it was manipulative.  The Policy, she maintained, was "being used to manipulate me into taking the 'vaccine.'"  It "is not," in fact, "a vaccine," she continued, but rather "gene therapy that contains harmful and wrong substances" she could not ingest consistent with her religious beliefs.  Yet the University consistently and repeatedly invited DeVore to undertake a testing regimen that would permit her to remain unvaccinated, and DeVore has offered no evidence to support the proposition that the Policy denied her a bona fide choice between testing and vaccination.  DeVore therefore cannot demonstrate a conflict between her religion and the Policy solely by bootstrapping her testing objections to her vaccine objections.

DeVore's final objection to the Policy was that it was "being used as a form of coercion."  She explained that coercion is "morally and ethically inappropriate by the laws of the land and, most importantly, in the sight of God," elaborating that "[c]oercion, incentives, guilt, penalties, being forced to participate in an experiment with no right to choose, no truly informed consent. It goes against justice, righteousness, all that is honorable and true, therefore it goes against all that God is and how He would have me live."  She underscored that COVID testing was "wrong on

so many levels" and that it "should not be forced on any individual who chooses not to participate."

The University explored the nature of DeVore's coercion objection with her at her deposition, where she broke it out across two dimensions. The first dimension she identified was the Policy's attempt to "coerce [her] to get vaccinated," an effort she said would "coerce me into doing something I simply cannot do." Such coercion, she explained, was "wrong" because "[t]rying to manipulate somebody into doing something to attain a result that you want by holding something over them" is "not right behavior." DeVore's explanation of this dimension of the coercion objection repackages her manipulation concern. Again, however, that cannot alone establish a conflict between her religion and the Policy because DeVore has adduced no evidence supporting her claim that the Policy had the practical effect of coercing her to vaccinate rather than test.

The second dimension of coercion DeVore raised was the Policy's design "to coerce [her] to get tested." DeVore reasoned that mandatory employment requirements, like the Policy, are inherently coercive because she "would lose [her] job" unless she complied. She acknowledged that employers routinely maintain a range of compulsory employment requirements, a general practice to which she did not object, but she drew the line at policies that were not "equitable" or "fair." This second dimension of DeVore's coercion objection applies to oral swab and saliva testing, but it turns only on DeVore's view that mandatory testing is inequitable and unfair. DeVore drew no connection between her fairness conclusion and any "religious principle" she follows, leaving it simply to reflect her "personal moral code." *Welsh*, 398 U.S. at 342–43 (quoting *Seeger*, 380 U.S. at 172). DeVore's "subjective evaluation" of the Policy against this rubric of "secular values" does not establish a religious conflict with the Policy. *Yoder*, 406 U.S. at 216.

DeVore offers no other evidence to show a conflict between her religion and the Policy. She supplied no affidavit or declaration articulating how complying with the Policy conflicts with her religious beliefs or practices. She entered none of her own deposition testimony in the record to add color to the excerpts the University provides. She filed a six-page complaint, which in any event is unverified, that included only the conclusory statement that "due to her

deeply held religious beliefs," she "objected to mandatory Covid testing." DeVore has, in fact, throughout this litigation never identified in the record what her religion is.

In the end, DeVore's religious opposition to the Policy flows almost entirely from her objections to nasal PCR testing and vaccination, objections she raised before the University informed her that she could comply with the Policy via oral swab or saliva tests, and she fails to account for these alternatives. Her invasiveness objection responds only to nasal swab testing, her manipulation objection ignores testing as a bona fide substitute for vaccinating, and her coercion objection doubles down on her manipulation objection, supplementing it with only her "personal" characterization of mandatory testing as inequitable and unfair. *Yoder*, 406 U.S. at 216. These objections may have been enough to satisfy Title VII's pleading requirements. *See Lucky*, 103 F.4th at 1242–44; *Savel v. MetroHealth Sys.*, 96 F.4th 932, 942–44 (6th Cir. 2024); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1008–12 (7th Cir. 2024); *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 900–02 (8th Cir. 2024). But they fail at summary judgment to establish a conflict between DeVore's religion and the Policy. DeVore's Title VII claim fails with them.

## IV. CONCLUSION

For these reasons, we **AFFIRM**.